*JH*

UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

```
———————————————————————x
                                          :
U.S. FUTURES EXCHANGE, L.L.C.,            :
311 South Wacker Drive                    :
Suite 3751                                :
Chicago, IL  60606,                       :
                                          :
          and                             :
                                          :
U.S. EXCHANGE HOLDINGS, INC.,             :
311 South Wacker Drive                    :
Suite 3751                                :
Chicago, IL  60606,                       :
                                          :
                    Plaintiffs,           :
                                          :
                                          :        Civil No. 1:04cv6756
          v.                              :        Judge James B. Zagel
                                          :
BOARD OF TRADE OF THE CITY                :
OF CHICAGO, INC.                          :
141 West Jackson Boulevard                :
Chicago, IL  60604-2994,                  :
                                          :
          and                             :
                                          :
CHICAGO MERCANTILE EXCHANGE INC.,         :
20 South Wacker Drive                     :
Chicago, IL  60606,                       :
                                          :
                    Defendants.           :
———————————————————————x
```



**SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiffs U.S. Futures Exchange, L.L.C., ("USFE") and U.S. Exchange Holdings,

Inc. ("U.S. Holdings"), for their Second Amended Complaint, allege as follows:

## NATURE OF THE ACTION

1.     This is an action to halt and redress violations of the U.S. antitrust laws in the markets for exchange services for U.S. Treasury futures and options on U.S. Treasury futures. Defendant Board of Trade of the City of Chicago, Inc. ("CBOT") has monopolized these markets for many years.

2.     In 2003, plaintiffs decided to launch a registered U.S. electronic exchange that would compete head-to-head with CBOT.

3.     In response, CBOT and the Chicago Mercantile Exchange ("CME") knowingly and intentionally entered into an unlawful course of conduct to prevent USFE's entry into the markets for exchange services for U.S. Treasury futures and options on U.S. Treasury futures, and thereafter to exclude USFE from those markets. The unlawful course of conduct included acts and practices to monopolize, conspiracy to monopolize, conspiracy to restrain trade, and tortious interference with plaintiffs' prospective business advantage.

4.     As a result, one year after its launch, USFE has failed to capture a more than trivial portion of the market. Defendants' illegal conduct has deprived consumers of meaningful competition among venues for trading U.S. Treasury futures and options on U.S. Treasury futures.

5.     The U.S. antitrust laws flatly prohibit CBOT and CME's conduct and the resulting antitrust injury to plaintiffs and consumers. In this action, plaintiffs seek the ability to compete fairly and fully. At bottom, defendants should be held to play by the rules and to recompense plaintiffs for their flagrant refusal to do so.

2

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action for treble damages and injunctive relief under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under § 1 (15 U.S.C. § 1), and § 2 of the Sherman Act (15 U.S.C. § 2), and § 4(a) and § 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This Court has supplemental jurisdiction over the state law claims for damages under 18 U.S.C. § 1367.

7.     This Court has personal jurisdiction over CBOT under 735 Ill. Comp. Stat. 5/2-209(a)(1), § 12 of the Clayton Act (15 U.S.C. § 22) and generally because, upon information and belief, CBOT transacts business within the jurisdiction.

8.     This Court has personal jurisdiction over CME under 735 Ill. Comp. Stat. 5/2-209(a)(1), § 12 of the Clayton Act (15 U.S.C. § 22) and generally because, upon information and belief, CME transacts business within the jurisdiction.

9.     Venue is proper in the Northern District of Illinois under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

10.     Plaintiff USFE is a Delaware limited liability company with its principal place of business in Chicago, Illinois. USFE is a subsidiary of plaintiff U.S. Holdings.

11.     Plaintiff U.S. Holdings is a Delaware corporation with its principal place of business in Chicago, Illinois. U.S. Holdings is a wholly owned subsidiary of Eurex Frankfurt AG ("Eurex").

3

12.     Defendant CBOT is a Delaware corporation with its principal place of business in Chicago, Illinois. CBOT operates a futures exchange. It has an office located at 141 West Jackson Boulevard, Chicago, Illinois, 60604.

13.     Defendant CME is a Delaware corporation with its principal place of business in Chicago, Illinois. CME operates a futures exchange. It has an office located at 20 South Wacker Drive, Chicago, Illinois, 60606.

14.     Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce. Defendant CBOT operates a futures exchange for, *inter alia*, financial instruments, in interstate commerce. Defendant CME operates a futures exchange and clearinghouse for the trading of futures and options on futures, in interstate commerce.

15.     Defendants' wrongful conduct and acts in furtherance of their conspiracy took place in part in the Northern District of Illinois.

## FACTUAL BACKGROUND

### Trading in Commodity Futures and Options on Future Contracts

16.     A commodity futures contract ("Futures Contract") is an agreement to buy (or sell) a specific amount of an underlying commodity (which can be a financial instrument) at a particular price on a stipulated future date. Futures Contracts that are standardized are usually traded on futures exchanges that are regulated by the U.S. Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act and CFTC Regulations promulgated thereunder (a regulated exchange is referred to herein as a "Futures Exchange").

4

17. An option on a Futures Contract ("Options Contract") is a contract that gives the option holder the right, but not the obligation, to buy (or sell) the underlying Futures Contract at a specified price from (or to) the option seller on or before a specified date. Options on futures are traded on Futures Exchanges.

18. Futures Contracts on U.S. Treasury securities are among the most actively traded Futures Contracts. Options Contracts on U.S. Treasury futures are also actively traded. U.S. Treasury futures and options on U.S. Treasury futures are prized by investors as being highly liquid investments that minimize the risks that are posed by principal-to-principal bilateral contracts, such as counterparty credit risks, legal uncertainty, and lack of transparency. U.S. Treasury Futures Contracts typically include futures on Two-Year, Five-Year, and Ten-Year U.S. Treasury Notes, and Thirty-Year U.S. Treasury Bonds.

19. With few exceptions, Futures and Options Contracts can only be bought or sold in the U.S. on futures exchanges electronically or in person on exchange floors. Members of Futures Exchanges trade Futures and Options Contracts for themselves or on behalf of customers located throughout the United States and the world.

20. Exchange services are those services associated with the maintenance of an anonymous and liquid marketplace of standardized products and include a transaction mechanism, market information and clearing services.

21. An exchange must provide clearing services through its own clearinghouse or by contracting with a separate clearinghouse. Clearinghouses are

essential because they guarantee each trade. Clearinghouses assume the risk that a party will not fulfill its obligation under the contract.

**Board of Trade of the City of Chicago, Inc.**

22.     CBOT is a Futures Exchange that offers trading in futures and options on futures on agricultural and financial commodities. For many years, CBOT has monopolized the market for exchange services for U.S. Treasury futures and options on U.S. Treasury futures. Today, with respect to exchange trading, almost all U.S. Treasury futures and options on U.S. Treasury futures are traded on CBOT. Investors throughout the world buy and sell U.S. Treasury futures and options on U.S. Treasury futures on the CBOT.

23.     In the last decade, much exchange-based trading has moved from in-person trading on exchange floors to electronic trading via computer. In 1999, CBOT contracted with Eurex to obtain a platform for trading electronically. Beginning in 2000 and continuing through 2003, Eurex provided CBOT with the hardware, software and service necessary to trade electronically. In 2003, CBOT did not renew its contract with Eurex, and Eurex decided to launch a competing exchange in the United States.

24.     From 1925 until 2003, CBOT cleared its transactions through the Board of Trade Clearing Corporation ("BOTCC"). BOTCC was a registered clearinghouse owned by clearing member firms of the CBOT and by the MidAmerica Commodity Exchange, a smaller exchange. Historically, BOTCC was primarily engaged in the business of clearing trades for CBOT. After Eurex announced its intention to enter into competition with CBOT and sought to enter into a contract with BOTCC for clearing services, CBOT

6

terminated its long-term clearing relationship with BOTCC, depriving it of its primary source of revenue and leaving its future in doubt. After severing its relationship with BOTCC, CBOT entered into a clearing services agreement with rival exchange CME.

25.    Beginning in 2004, CBOT cleared its transactions through the newly formed CME/CBOT Common Clearing Link. Under this arrangement, CME's own clearinghouse settles and guarantees all of CBOT's trades. Once operational, the CME/CBOT Clearing Link cleared all but a trivial share of U.S. Treasury futures and options on U.S. Treasury futures.

**Chicago Mercantile Exchange Inc.**

26.    CME is one of the largest futures exchanges in the United States and the world. Pursuant to the clearing services agreement between CBOT and CME, on January 2, 2004, CME began providing the same clearing services to CBOT that historically had been provided by BOTCC.

27.    CME benefits from CBOT's continued monopoly, including through revenues that reflect CBOT's monopoly position through income earned from providing clearing services to CBOT's exchange. CME has been motivated to cooperate with CBOT and entered into the clearing services agreement, because, on information and belief, it wishes to prevent USFE from competing in CME's markets.

**U.S. Futures Exchange and U.S. Holdings**

28.    USFE is a U.S. company 86% owned by U.S. Holdings, which is a 100% subsidiary of Eurex Frankfurt AG ("Eurex"), and 14% owned by Exchange Place Holdings, L.P., a Delaware limited partnership.

29.     On January 10, 2003, Eurex announced publicly its intention to launch a U.S. registered futures exchange to compete in the markets for exchange services for futures and options in the United States. The exchange – USFE – would offer trading in a wide range of U.S. dollar- and euro-denominated interest rate and stock index products, including U.S. Treasury futures and options on U.S. Treasury futures.

30.     USFE intended to provide effective competition to CBOT. With the opening of the exchange announced for February 1, 2004, USFE expected to offer customers a wide array of benefits, including cheaper and easier market access, greater transparency, broader distribution, and lower costs.

31.     After CBOT terminated its clearing relationship with BOTCC, Eurex entered into a series of agreements with the clearinghouse, which reorganized and was renamed The Clearing Corporation ("CCorp"). Specifically, the parties agreed that U.S. Holdings would invest $15 million in consideration for an equity stake in CCorp.

32.     On September 16, 2003, USFE filed its application for CFTC approval to operate a Futures Exchange in the United States. USFE sought expedited treatment of its application under the agency's 60-day "fast-track review" process.

33.     In October 2003, the CFTC removed USFE's application from the fast track and extended the review process to the legal maximum of 180 days. The change in schedule forced USFE to alter its planned launch date until after February 8, 2004.

34.     In November 2003, USFE and the National Futures Association ("NFA") signed an agreement under which the NFA would supply regulatory and related services

8

to plaintiffs' new exchange. Such services were an essential requirement for plaintiffs' new entry and were required for CFTC approval of plaintiffs' application.

35.     During the CFTC approval process, USFE attempted to generate a customer base of market makers and brokerage firms that were trading on CBOT. When the CFTC approval process was delayed, creating significant uncertainty about approval, potential customers did not move their business to USFE but remained at CBOT.

36.     The CFTC approved the application for USFE on February 4, 2004, and USFE was finally launched on February 8, 2004.

37.     During and subsequent to the CFTC approval process, CCorp and USFE also sought approval for the Global Clearing Link, which would give CCorp access to Eurex's European products and also would allow customers around the world to clear USFE products via Eurex's European clearinghouse. This would allow customers to open positions at a European exchange and close them at a U.S. exchange, and vice versa, providing for fungibility and more effective usage of collateral pools. As of the date of this complaint, the Global Clearing Link still awaits final regulatory approval.

38.     Since its launch in February 2004, USFE has continued to fight against CBOT's and CME's anticompetitive tactics, but has failed to capture a more than trivial portion of the markets for exchange services for U.S. Treasury futures and options on U.S. Treasury futures.

9

**CBOT's and CME's Unlawful Efforts to Prevent USFE from Creating and Operating a Competitive Exchange for U.S. Treasury Futures and Options on U.S. Treasury Futures**

39.     From the day they learned of USFE's intention to enter the markets for exchange services for U.S. Treasury futures and options on U.S. Treasury futures, defendants CBOT and CME have conspired to carry out an aggressive campaign to prevent, hamper, and delay USFE from creating a competing Futures Exchange, and thus to preserve CBOT's monopoly position and CME's economic interest therein.

**Erection of Barriers to Competition through Misuse of Clearinghouse Services**

40.     For 78 years, CBOT cleared its trades through BOTCC pursuant to a non-exclusive relationship. Upon information and belief, as soon as Eurex informed CBOT that it intended to launch a U.S. exchange, as part of its effort to preclude USFE from entering the market, CBOT sought to eliminate BOTCC as a possible clearinghouse for USFE. When that failed, CBOT attempted to put it out of business. Then, it conspired with its traditional rival, CME, to control all but a trivial share of the clearing of exchange trades of U.S. Treasury futures and options on U.S. Treasury futures.

41.     Upon information and belief:

(a)     CBOT, a monopolist, sought an exclusive agreement with CCorp to prevent USFE from having access to essential services;

(b)     CBOT then offered to acquire CCorp in order to prevent CCorp from offering clearing services to any other party, including USFE; and

(c)     when that plan failed, CBOT entered into an exclusive agreement with CME but still attempted to block USFE from establishing a clearing relationship with CCorp by offering to purchase it for $150-200 million, for the sole purpose of shutting down the business and denying USFE access to an established clearing infrastructure and network.

10

42.     Upon information and belief, CBOT continued its campaign to use clearing operations to keep USFE out of the market by using the CME/CBOT Clearing Link, an exclusive arrangement, and exercised its monopoly power to:

(a)     maintain control of the execution of all but a trivial share of trades of U.S. Treasury futures and options on U.S. Treasury futures;

(b)     force certain firms to abolish their existing contractual relationships with CCorp and sign with the CME/CBOT Clearing Link;

(c)     transfer all trades in progress from CCorp to the CME/CBOT Clearing Link, thereby preventing traders from using CCorp and trading on USFE; and

(d)     erect insurmountable barriers to competition by USFE.

43.     The effect of the attempts to eliminate CCorp and the creation of the CME/CBOT Clearing Link was, and is, for CBOT and CME to dominate trading and clearing in the relevant markets, maintain their monopolies and foreclose any competition.

## Conduct Intended to Delay Regulatory Approval and Create Uncertainty in the Market to Prevent USFE from Loading a Customer Base

44.     Upon information and belief, in furtherance of their conspiracy with CBOT, CME engaged in improper interference with plaintiffs' business relationship with the NFA, pursuant to which the NFA provides compliance and regulatory services for USFE. These actions included, but are not limited to the following:

(a)     misrepresenting the NFA's lawful capacity and practical ability to perform the compliance and regulatory services for USFE, when CME knew, or should have known, that the NFA could provide such services, and is in fact now providing such services; and

11

(b)    threatening to sue to invalidate the NFA's regulatory services agreement with USFE in order to prevent the NFA from offering regulatory services to USFE, thereby delaying or preventing USFE's establishment of a competing exchange.

45.    Upon information and belief, after USFE filed its application with the CFTC in September 2003, CBOT and CME embarked on a coordinated strategy of deception and misinformation designed to forestall or prevent competition by USFE.

46.    Upon information and belief, as part of that strategy, CBOT and CME made numerous material misrepresentations to members of Congress, the CFTC, the industry press, potential customers of USFE, and the financial community at large, including, but not limited to the following false allegations:

(a)    USFE did not tell the truth in seeking government approvals;

(b)    USFE announced a business plan it had no intention of operating;

(c)    USFE misled the government and manipulated the approval process;

(d)    USFE intended to implement a business plan without following the law;

(e)    USFE interfered with CME's placement of electronic trading terminals in Germany; and

(f)    the NFA was without legal authority and practical ability to provide contract regulatory services.

47.    Upon information and belief, defendants' material misrepresentations were made despite the fact that defendants knew or should have known that all such statements were untrue. The misrepresentations were made in bad faith, and were intended to and did in fact prevent competition by USFE. Upon information and belief,

defendants' statements had no objective basis in fact and were made for the purpose of preventing competition by USFE in the relevant markets.

48.     Upon information and belief, defendants' purpose in making such statements was to abuse the government process, to create public doubt about the feasibility of USFE's market entry, and thereby to suppress USFE's efforts to compete in the relevant markets.

49.     Upon information and belief, defendants' unlawful statements prevented USFE from building a customer base, caused regulatory approval of the USFE-CCorp Global Clearing Link to be derailed, and otherwise deprived USFE of the ability to create a competitive alternative to CBOT's monopoly in the relevant markets.

50.     Upon information and belief, during the approval process, CBOT and CME willfully and deliberately engaged in other unlawful exclusionary conduct designed to erect barriers to competition and prevent USFE from entering the market, including a strategy of predatory pricing in setting fees for certain trades, denying USFE legitimate access to potential customers, threatening traders that support USFE, continuing a deceptive public campaign to block regulatory approval of the Global Clearing Link, and engaging in other unlawful exclusionary conduct yet to be discovered, all for the purpose of preventing, hindering, or delaying competition and maintaining CBOT's monopoly in the market for U.S. Treasury futures and options on U.S. Treasury futures.

51.     Upon information and belief, in response to the perceived competitive threat from USFE, beginning prior to USFE's planned launch in February 2004 and continuing to the date of this complaint (as exemplified by a dramatic price cut four days

13

before USFE's launch), CBOT has engaged in unlawful predatory pricing in the fees
charged to trade U.S. Treasury futures and options on U.S. Treasury futures. In some
instances, the fee CBOT charged to engage in such trades was $0.00. CBOT engaged in
such below-cost transactions with the objective of excluding USFE from the market,
thereby damaging competition, preserving its monopoly and thereafter recouping any lost
profits.

### RELEVANT MARKET AND CBOT'S MONOPOLY POWER

52.     The provision of CFTC-regulated exchange services for U.S. Treasury
Futures Contracts is a line of commerce or relevant product market within the meaning of
the antitrust laws. The provision of exchange services for Futures Contracts on (i) Two-
Year U.S. Treasury Notes; (ii) Five-Year U.S. Treasury Notes; (iii) Ten-Year U.S.
Treasury Notes; and (iv) Thirty-Year U.S. Treasury Bonds, are for certain traders
relevant product markets.

53.     The provision of CFTC-regulated exchange services for Options Contracts
on U.S. Treasury futures is a line of commerce or relevant product market within the
meaning of the antitrust laws. The provision of exchange services for Options Contracts
on U.S. Treasury futures on (i) Two-Year U.S. Treasury Notes; (ii) Five-Year U.S.
Treasury Notes; (iii) Ten-Year U.S. Treasury Notes; and (iv) Thirty-Year U.S. Treasury
Bonds, are for certain traders relevant product markets.

54.     U.S. Futures Exchanges differ significantly from other trading
environments, such as over-the-counter trades, because the regulatory environment
mandates accurate price discovery and greater economic certainty and transparency of

14

transactions. U.S. Futures Exchanges also allow anonymity and a large customer base, provide increased liquidity, and offer a distinct set of tax advantages. The result of regulation, as a practical matter, is that certain investors are limited to trading on regulated U.S. Futures Exchanges.

55.     No reasonable substitute financial instruments or commodities are available to buyers and sellers that seek the specialized financial benefits that exchange-traded U.S. Treasury futures and options on U.S. Treasury futures provide.

56.     Substantial barriers to entry and expansion exist in the relevant markets. The considerable time and expense required to develop a competing exchange and obtain the necessary regulatory approval from the CFTC are high barriers to entry.

57.     CBOT's market domination and the existence of high entry barriers are evidenced by its historically high prices for its services.

58.     The consumers of U.S. Treasury futures and options on U.S. Treasury futures are located around the globe. For an exchange to offer services for U.S. Treasury futures and options on U.S. Treasury futures and effectively compete with CBOT, it must be located in the United States. The U.S. regulatory framework provides a set of protections and incentives that make trading U.S. Treasury futures and options on U.S. Treasury futures on a Futures Exchange unique. Additionally, a substantial customer base requires a U.S.-based exchange. U.S. Treasury futures and options on U.S. Treasury futures are not traded on a European exchange. For these reasons, Eurex decided to create a U.S.-regulated exchange.

59.     Accordingly, the United States is a relevant geographic market within the meaning of the antitrust laws.

60.     CBOT is the dominant exchange offering exchange services for U.S. Treasury futures and the dominant exchange offering exchange services for options on U.S. Treasury futures in the relevant geographic market. CBOT possesses monopoly power in the relevant markets, where its share of trades remains well in excess of 90 percent. CBOT has the power to control prices and exclude competition in the relevant markets.

61.     The most likely source of effective competition to CBOT's monopoly in the relevant markets is through USFE's competing exchange. USFE's entry threatens to take significant sales away from CBOT.

## EFFECTS OF DEFENDANTS' UNLAWFUL SCHEME

62.     USFE's entry was expected to bring competition to the markets. USFE's plan offered increased market efficiency, increased transparency, increased choice to customers, greater access, and lower costs. Absent defendants' unlawful conduct, these benefits would be passed on to the users of the exchange and their customers.

63.     Defendants' unlawful conduct has impeded, hampered, and delayed USFE's successful entry into the relevant markets in an attempt to preserve CBOT's monopoly position, allowing it to charge supracompetitive prices for its services for as long as possible at the expense of the public, and hindered USFE's eventual entry into CME's markets.

64. Defendants' unlawful conduct prevented competition by USFE in the relevant markets, proximately caused damage and antitrust injury to USFE, and thereby deprived consumers of the benefits of competitive markets. Defendants' unlawful conduct substantially and adversely affected interstate commerce.

## CLAIMS FOR RELIEF

### COUNT ONE

#### Violation of Sherman Act, Section 2 – Monopolization

65. Plaintiffs reallege and incorporate herein by reference the allegations set forth herein.

66. The provision of exchange services for U.S. Treasury futures and options on U.S. Treasury futures are relevant product markets and the United States is a relevant geographic market.

67. Defendant CBOT possesses monopoly power in the relevant markets. Substantial barriers to entry and expansion exist in the relevant markets.

68. Defendant CBOT has the power to control market prices and exclude competition in the relevant markets.

69. Defendant CBOT has engaged in and continues to engage in a pattern of unlawful conduct to maintain and enhance its monopoly in the relevant markets and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to prevent USFE from establishing a U.S. regulated securities

17

exchange. It has done so willfully and deliberately in order to monopolize the relevant markets.

70.     Plaintiffs have suffered antitrust injury and will continue to suffer additional antitrust injury unless the unlawful conduct is prohibited.

## COUNT TWO

### Violation of Sherman Act, Section 2 – Conspiracy to Monopolize

71.     Plaintiffs reallege and incorporate herein by reference the allegations set forth herein.

72.     Defendants CBOT and CME formed, joined and participated in an unlawful conspiracy to monopolize the relevant markets.

73.     In furtherance of the conspiracy to monopolize, defendants have engaged in a pattern of unlawful conduct intended to maintain and enhance CBOT's monopoly in the relevant markets, and CME's economic interest therein, and to keep prices high, stifle competition and eliminate consumer choice through exclusionary behavior.

74.     Each of the conspirators performed at least one act in furtherance of the conspiracy.

75.     Defendants' conspiracy is ongoing and continues to present day.

76.     Defendants have engaged in their conduct willfully and deliberately with the specific intent to monopolize the relevant markets.

77.     Plaintiffs have suffered antitrust injury and will likely suffer additional antitrust injury unless the unlawful conduct is prohibited.

## COUNT THREE

### Violation of Sherman Act, Section 1 – Conspiracy in Restraint of Trade

78.     Plaintiffs reallege and incorporate herein by reference the allegations set forth herein.

79.     Defendants CBOT and CME knowingly and intentionally formed, joined and participated in a conspiracy in unreasonable restraint of trade in the relevant markets.

80.     Defendants' conspiracy is ongoing and continues to the present day.

81.     Defendants' agreement and their conduct in pursuance thereof are having substantially adverse effects on competition in the relevant markets.

82.     Plaintiffs have suffered antitrust injury and will likely suffer additional antitrust injury unless the unlawful conduct is prohibited.

## COUNT FOUR

### Tortious Interference With Prospective Economic Advantage

83.     Plaintiffs reallege and incorporate herein by reference the allegations set forth herein.

84.     Plaintiffs have undertaken a substantial business effort, investing significant time and expense, to create a new business enterprise.

85.     Defendants had knowledge of the existence of plaintiffs' intent to engage

in this prospective business opportunity.

86.     Defendants intentionally and unjustifiably interfered with plaintiffs'

business opportunity by engaging in their improper and unlawful campaign to prevent

USFE's entry into the futures market.

87.     Defendants' wrongful acts have caused and are likely to cause additional

damages to plaintiffs, in an amount to be proved at trial.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

A.      Find that CBOT is wrongfully maintaining its monopoly over the
        provision of exchange services for U.S. Treasury futures and options on
        U.S. Treasury futures in violation of Section 2 of the Sherman Act and
        award plaintiffs treble damages in an amount to be proven at trial,
        pursuant to § 4(a) of the Clayton Act, 15 U.S.C. § 15(a);

B.      Find that CBOT and CME are conspiring to maintain CBOT's
        monopoly over the provision of exchange services for U.S. Treasury
        futures and options on U.S. Treasury futures in violation of Section 2 of
        the Sherman Act and award plaintiffs treble damages in an amount to be
        proven at trial, pursuant to § 4(a) of the Clayton Act, 15 U.S.C. § 15(a);

C.      Find that CBOT and CME are conspiring to unreasonably restrain trade
        in the provision of exchange services for U.S. Treasury futures and
        options on U.S. Treasury futures in violation of Section 1 of the
        Sherman Act and award plaintiffs treble damages in an amount to be
        proven at trial, pursuant to § 4(a) of the Clayton Act, 15 U.S.C. § 15(a);

D.      Find that CBOT and CME are tortiously interfering with plaintiffs'
        prospective business opportunities and award plaintiffs compensatory
        and punitive damages.

20

E.  Grant preliminary and permanent injunctive relief prohibiting defendants and all persons, firms and corporations acting on their behalf and under their direction or control from continuing violations of Sections 1 and 2 of the Sherman Act, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, as well as from the continuing violation of state law alleged herein;

F.  Award plaintiffs such other relief as is necessary or appropriate to restore and maintain competitive conditions in the markets affected by defendants' unlawful conduct; and

G.  Award plaintiffs attorneys' fees and costs of this action.


Dated:  March 25, 2005                     Respectfully submitted,


John Shugrue
Paul Walker-Bright
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Sixth Floor
Chicago, IL 60601
Tel:  (312) 324-1000
Fax:  (312) 324-1001

John H. Shenefield (admitted *pro hac vice*)
Jonathan M. Rich (admitted *pro hac vice*)
Tara L. Reinhart (admitted *pro hac vice*)
Christopher E. Tierney (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 739-3000
Fax:  (202) 739-3001

*Counsel for Plaintiffs*
*U.S. Futures Exchange L.L.C.*
*and U.S. Exchange Holdings, Inc.*

## CERTIFICATE OF SERVICE

I, Gregory F. Wells, hereby declare under penalty of perjury as follows:

I am employed by Morgan Lewis & Bockius, LLP, 1111 Pennsylvania Ave., NW,

Washington, D.C. 20004. I am over the age of eighteen years and am not a party to this

action. On March 25, 2005, I served a copy of the following document:

- **PLAINTIFFS' SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

on the following persons by causing a true and correct copy of same to be sent via

facsimile and Federal Express:

| | |
|---|---|
| Linda L. Listrom<br>Norman M. Hirsch<br>Jenner & Block, LLC<br>One IBM Plaza<br>330 North Wabash Avenue<br>40th Floor<br>Chicago, IL 60611<br>Fax: (312)527-0484<br><br>Matthew Hersh<br>Thomas John Perrelli<br>Jenner & Block LLP<br>601 13th Street<br>1200 South<br>Washington, DC 20005<br>Fax: (202)639-6066 | Jerrold E. Salzman<br>Chris C. Gair<br>Freeman, Freeman & Salzman, P.C.<br>401 North Michigan Avenue<br>Suite 3200<br>Chicago, IL 60611<br>Fax: (312)828-9878<br><br>Mark C. Hansen<br>Reid Mason Figel<br>Kellogg, Huber, Hansen, Todd & Evans<br>1615 M Street, N.W.<br>Sumner Square, Suite 400<br>Washington, DC 20036<br>Fax: (202)326-7999 |
| Counsel for Defendant Board of Trade of the City of Chicago | Counsel for Defendant Chicago Mercantile Exchange, Inc. |

Dated: March 25, 2005

Gregory F. Wells
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
Phone:        (202) 739-3731
Facsimile:   (202)739-3001

1