**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| U.S. FUTURES EXCHANGE LLC and U.S. EXCHANGE HOLDINGS, INC., <br><br>    Plaintiffs, <br><br>    v. <br><br>BOARD OF TRADE OF THE CITY OF CHICAGO and CHICAGO MERCANTILE EXCHANGE INC., <br><br>    Defendants. | No. 04 C 6756 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I.    BACKGROUND**

The facts of this case have been laid out in detail in previous orders and are incorporated by reference herein. On February 14, 2007, in an effort to move the case forward in the face of a complex and costly discovery impasse, I granted Defendants leave to move for partial summary judgment. Defendants represented to the court that, based on the substantial discovery that had already been taken, they could knock out several of Plaintiffs' theories of liability, which would narrow the scope of the case and help resolve outstanding discovery issues. Specifically, Defendants proposed that we proceed under the assumption that they had in fact engaged in all alleged anti-competitive conduct so that the available evidence on causation and injury could be isolated and tested. Defendants believed they could conclusively prove that much of the alleged anticompetitive conduct they are accused of engaging in could not possibly have caused antitrust injury. I agreed to this course of action and granted Defendants leave to test three of Plaintiffs' theories of liability: 1) Defendants obstructed the regulatory approval process in order to

hamstring USFE's launch; 2) Defendants erected barriers to USFE's entry by preventing it from securing competitive clearing services; and 3) Defendants interfered with Plaintiffs' customer relationships through a campaign of threats and misinformation.[1]

## II.   STANDARD OF REVIEW

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, that burden does not necessarily require the moving party to put forth evidence negating the non-moving party's claims; summary judgment is proper against a non-moving party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

---

[1] A fourth theory of liability, predatory pricing, was dealt with in a separate set of briefings.  I granted summary judgment to Defendants on this theory on July 2, 2010.

**III.     ANALYSIS**

    A.     <u>Antitrust Injury</u>

Before examining the individual theories of liability, I begin by addressing Defendants' attempted knock-out-punch claim that Plaintiffs have not suffered antitrust injury.  In order to have standing to bring an antitrust suit, a plaintiff must establish that its claimed injuries are "of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Tri-Gen v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir.2006) (internal quotations omitted) (quoting *Brunswick Corp. V. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  In other words, Plaintiffs must establish that Defendants' actions caused market injury (i.e. injury to consumers) by reducing output or raising prices, not just injury to themselves.  *See U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626-27 (7th Cir. 2003); *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992).

Defendants argue that Plaintiff cannot show antitrust injury because since USFE's opening, "trading is up and fees are down" in the U.S. Treasury futures market.  It does not take a world renowned economist to spot the glaring logical error in this statement.  The relevant consideration in determining whether Plaintiff has antitrust standing is not the current general state of the U.S. Treasury futures market.   It is the much more complicated counterfactual comparison between the U.S. Treasury futures market as it exists today and the market that would have existed had Defendants' alleged anticompetitive conduct never taken place.

Even without Dr. Hausman's declaration Defendants cannot prevail on the antitrust injury question at this stage.  Basic economic principles concerning the downward pressure on price

3

created by competition are so well established that, in the context of this partial summary judgment exercise, this issue is effectively off the table. This case is distinguishable from *Stamatakis Industries, Inc. V. King*, 965 F.2d 469 (7th Cir. 1992). The alleged injury here is not decreased competitor market share but inability to *enter* the market, in any meaningful sense, due to Defendants' anticompetitive actions. Defendants' motion for summary judgment for inability to show antitrust injury is denied.

      B.      <u>Obstruction of Regulatory Approval</u>

Plaintiffs' first theory of antitrust liability is that Defendants engaged in a bad faith misinformation campaign in order to "prevent, hamper, and delay" USFE from obtaining CFTC approval to launch its exchange. According to Plaintiffs, Defendants made knowingly false statements to the CFTC and Congress[2] and engaged in other dilatory tactics in order to remove USFE's DCM application from the CFTC's 60-day "fast-track" application procedure and spread doubt in the market about its ultimate approval.

Defendants make three arguments in response. First, Plaintiffs cannot prove injury because, despite any alleged delays in CFTC approval, USFE opened on February 8, 2004, just one week after its earliest possible opening date under the terms of the Eurex-CBOT alliance. Second, Plaintiffs cannot prove causation because there is no evidence in the record attributing the CFTC's decision to remove USFE's application from the fast track to anything Defendants

---

[2]Defendants statements to Congress do not themselves give rise to liability because Congress played no direct role in approving USFE's DCM application. Plaintiffs point to them as evidence that Defendants' comments to the CFTC were made with intent to preserve CBOT's monopoly position in the U.S. Treasury futures market.

did. Third, even if Plaintiffs could establish causation and injury, Defendants' actions are shielded by the *Noerr–Pennington* doctrine.

I am unpersuaded by the first two arguments. Defendants' injury argument mischaracterizes Plaintiffs' claim–the alleged injury is not the one-week delay in opening, it is the uncertainty and loss of forward momentum created within the market once the CFTC announced that it needed to take a harder look at USFE's application. More discovery would be needed on this issue before I could grant summary judgment. Nor do I find the causation argument compelling. The CFTC press release announcing the cancellation of the December 17, 2003 hearing on USFE's application due to "scheduling conflicts" of certain "market participants" at least raises a genuine issue of material fact over causation in light of the December 9, 2003 letters sent by the CBOT and CME CEOs requesting a delay.

I am, however, persuaded that Defendants' actions constituted protected lobbying activity under the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine extends absolute immunity under the antitrust laws to "businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus Group, LLC v. Lake Forest Hospital*, 641 F.3d 834, 841 (7th Cir. 2011). The doctrine addresses a tension between the First Amendment and the Sherman Act that frequently arises when businesses engage in protected political activity to protect a controlling position in their market. The immunity is extended "in part because the original purposes of the Sherman Act did not include regulating political activity and in part because it is questionable whether the First Amendment allows such regulations." *Premier Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 371 (7th Cir. 1987).

*Noerr-Pennington* immunity is not absolute. The "sham" exception allows the antitrust laws to reach otherwise protected First Amendment activity in two contexts: (1) sham lawsuits; and (2) fraudulent misrepresentations. *Mercatus*, 641 F.3d at 842. The fraudulent misrepresentation exception, which is at issue in this case, "does not apply *at all* outside of adjudicative proceedings." *Id*. at 844 (emphasis added). In other words, parties protected by *Noerr-Pennington* who knowingly lie to legislative bodies, or administrative bodies acting in legislative capacities, in order to protect their monopoly status are shielded from antitrust liability.

*Noerr-Pennington* immunity has existed since the 1960s, but since that time there has been some disparate application of the rule due in part to confusion over where to draw the line between adjudicative and legislative activity. In May 2011, the Seventh Circuit decided *Mercatus Group v. Lake Forest Hospital*, which took a considerable step toward resolving this confusion by compiling a list of indicative factors that higher courts have used to determine whether a proceeding is adjudicative or legislative.

Plaintiffs allege that Defendants made statements to the CFTC that Defendants knew to be false, and which materially delayed the approval of USFE's DCM application. Plaintiffs further argue that the sham exception applies here because the CFTC was acting in an adjudicatory role during the DCM application approval process. At the very least, Plaintiffs assert, further discovery is needed on this issue to determine 1) the full extent of Defendants' communications with the CFTC concerning USFE's DCM application; and 2) the nature of the CFTC proceedings to determine whether they were adjudicatory or legislative.

I disagree. Based on the factors laid out in *Mercatus* it is manifest that, in weighing USFE's DCM application, the CFTC was acting in a legislative capacity. First, although the CFTC has the power to act in both an adjudicatory and legislative capacity (unlike the city council in *Mercatus*, which only had legislative authority), key hallmarks of CFTC adjudicatory proceedings were missing here. There was no complaint filed with the Office of Proceedings to commence proceedings. 17 C.F.R. § 10.21. The hearings were not assigned to an Administrative Law Judge. 17 C.F.R. § 10.8. Second, the fact-finding process was highly informal. Evidence and testimony were not taken on the record and no recognizable rules of evidence applied. No testimony was given under oath or affirmation, under penalty of perjury. *Mercatus*, 641 F.3d at 845.

Third, the fact-finding process was subject to considerable lobbying and other ex parte influences. Plaintiffs admit that they met personally with individual Commissioners in connection with their application, and that this was a standard part of the application process. In addition, the CFTC solicited the *opinions* of the general public and federal policy-makers on USFE's application. *Id*. The relevance of such outside opinions to an adjudicatory proceeding is doubtful, but it is precisely the type of diverse information gathering typical to legislative proceedings.

Finally, I find that the CFTC's decision of whether to approve the DCM application is more a matter of discretionary authority than a decision guided by definite standards susceptible to judicial review. While 7 U.S.C. §§ 7(b) and 7(d) lay out eight application factors and eighteen core principles, respectively, for the CFTC to apply in considering DCM applications, these rules

7

are extremely general in nature. The sheer numerosity of considerations points to a high level of discretion and flexibility, and insusceptibility to meaningful judicial review. *Id.*

Given the above assessment, no amount of discovery into Defendants' lobbying of the CFTC can save Plaintiffs' claims concerning Defendants' obstruction of regulatory approval. The CFTC was acting in a legislative capacity and the fraudulent misrepresentation prong of the sham exception does not apply. Summary judgment on this theory is granted.

   C.  <u>Defendants Thwart USFE From Securing Competitive Clearing Services</u>

Plaintiffs' second theory of antitrust liability is that Defendants conspired to block USFE from obtaining competitive clearing services. There are three parts to this theory: 1) Defendants initially attempted to block USFE's access to its most promising source for clearing services, the Board of Trade Clearing Corporation (BOTCC); 2) once that failed, Defendants attempted to cripple USFE's ability to operate through the BOTCC by transferring open interest off the BOTCC thereby denying USFE access to crucial liquidity; and 3) Defendants precluded USFE from obtaining clearing services through CME by structuring the new "Common Clearing Link" (CCL) agreement between CBOT and CME in such a way as to create de facto exclusivity with respect to U.S. Treasury futures trades.

Defendants argue that Plaintiffs cannot prevail under this theory because under the Sherman Act, businesses have 1) independent discretion as to parties with which they will deal; and 2) no affirmative obligation to extend a helping hand to new competitors. Both of these points are true. The problem is that in making these arguments Defendants are violating their own terms for this partial summary judgment exercise. In general, it is no defense to say that, in the abstract, it was lawful for Defendants to terminate its relationship with the BOTCC, start a

new relationship with CME, and transfer open interest off the BOTCC. Under Section Two of the Sherman Act, otherwise lawful activity may be rendered unlawful if it is accompanied by a "specific intent to accomplish the forbidden objective." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). It is certainly no defense here, where, for purposes of this motion, we were to assume that Defendants had the requisite intent. Plaintiffs may be entitled to some further discovery from Defendants before the issue of intent can be resolved.

The expert reports on causation and injury, the only relevant evidence for purposes of this motion, are adequate to raise a genuine factual dispute over whether Defendants' alleged conspiracy to deny USFE access to clearing services was a "but for" cause of injury. *Greater Rockford Energy and Tech. Corp.*, 998 F.2d 391, 401 (7th Cir. 1993). Plaintiffs' claims under the second theory of liability survive.

   D.  <u>Customer Deterrence Through Threats and Intimidation</u>

Plaintiffs' final theory of liability is that Defendants deterred traders from trading on the USFE exchange through a campaign of threats and intimidation. Defendants put forth two arguments as to why they are entitled to summary judgment on this point: 1) Plaintiffs had frequent contact with traders in the lead up to the launch, and in fact were successful in signing up virtually every U.S. Treasury futures trader in the market; and 2) Plaintiffs have not been able to produce a single trader who will back up the claim.

Defendants' first argument gets us nowhere. Plaintiffs' claim is not that they were physically blocked from speaking with and even signing up traders, it is that traders who were able and willing to use the new exchange decided against it in the face of threats from the CBOT.

The fact that so many traders initially signed up to trade with USFE but ultimately decided against it lends some plausibility to Plaintiffs' claim.

Second, it is true that Plaintiffs have had considerable difficulty finding traders who will support their claims. I have several times expressed my own view that, even if the allegations are true, Plaintiffs are unlikely to secure trader testimony against Defendants given their dominant position in the U.S. Treasury futures market. The perceived costs to any trader may simply be too high, with no discernable benefit now that USFE has terminated all exchange operations. However, it is still possible that evidence exists in Defendants' own files. Plaintiffs have not had a full opportunity to examine appropriate documents in Defendants' possession, and until they have this opportunity I am unwilling to grant summary judgment on this issue.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is granted in part and denied in part. Both sides are to come prepared to the August 7th status with a discovery plan for moving forward on the surviving theories: 1) Defendants conspired to prevent Plaintiffs from obtaining effective clearing services; 2) Defendants interfered with USFE's relationships with traders.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: August 3, 2012