# Exhibit D

<pre>
 1                 THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   U.S. FUTURES EXCHANGE, L.L.C.,  )
                                     )
 4   et al.,                         )  No. 04 CV 6756
                                     )
 5          Plaintiffs,              )
                                     )
 6   vs.                             )  Chicago, Illinois
                                     )
 7   BOARD OF TRADE OF THE           )
     CITY OF CHICAGO, et al.,        )  December 7, 2012
 8                                   )
            Defendants.              )  12:08 o'clock p.m.
 9

10                   TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE JAMES B. ZAGEL

12
     For the Plaintiffs:
13
                    MORGAN, LEWIS & BOCKINS
14                  BY:  William P. Quinn
                    1111 Pennsylvania Avenue, NW
15                  Washington D.C. 20004

16

17   For the defendants:

18
                    FREEMAN, FREEMAN & SALZMAN, P.C.
19                  BY:  Jerrold E. Salzman
                    401 North Michigan Avenue
20                  Suite 3200
                    Chicago, Illinois 60611
21

22
            Court Reporter:
23                  Blanca I. Lara, CRR, RPR
                    219 South Dearborn Street
24                  Room 2318
                    Chicago, Illinois 60604
25                  (312) 435-5895
</pre>

1  think we're doing the sensible thing by saying let's recast

2  discovery in light of that ruling, but I do confess that we

3  have a little lack of understanding of what that ruling is.

4  With respect to the issue of the CFTC and the CFTC's

5  impact on Mr. Quinn's failure, I will agree that Mr. Quinn's

6  experts all testified that the reason for the failure was

7  because they were taken off the fast track.  So he's going to

8  have to eat that if we ever go to trial.

9  MR. QUINN:  This is simply untrue.

10  MR. SALZMAN:  No, it's not.

11  MR. QUINN:  Excuse me for interrupting.

12  THE COURT:  Go ahead.  Talk one at a time.

13  MR. SALZMAN:  Okay.  I mean, if we could ever get to

14  the Daubert motions again, we'll see that in fact is correct.

15  Anyway, but that doesn't mean that our conduct is open to

16  discovery.  His experts have taken that position and they're

17  stuck with that position, to the extent they did it.

18  And with respect to going forward, I say let's find

19  out what their claims are.  Is he really still claiming that

20  efforts that failed well before -- efforts to prevent them from

21  getting clearing failed well before they even began their

22  application process are in this case?  If so, let them put that

23  down, tell it to the judge, and we're going to ask that that be

24  dismissed because it's so silly.

25  MR. QUINN:  The notion that the Court's determination

12:33:35

12:33:55

12:34:09

12:34:28

12:34:47

1  that conduct before the CFTC that we allege as part of the

2  conspiracy cannot, in and of itself, be a basis for antitrust

3  liability, therefore means it has no bearing on this conspiracy

4  case, is unsound, that is not a sensible argument, and I'll

12:35:15  5  give you an example.

6         It's undisputed that we have to prove that there was

7  an agreement of some sort, it was concerted activity, and that

8  it had a purpose, and that it had an anticompetitive intent.

9  If there is, just by way of hypothetical example, a document,

12:35:33  10  an e-mail between one party and the other, discussing it, that

11  intent, that agreement, that objective, if there is such a

12  thing, it is just as likely to be in the context of a

13  discussion of their shenanigans before the CFTC as it is in a

14  discussion of their attempt to prevent Eurex, for example, from

12:36:00  15  gaining access to clearing services from BOTCC.

16         Now, that being the case, with Rule 26 we're entitled

17  to pursue evidence like that, that is clearly evidence that is

18  not relevant in the strictest sense, is evidence that would

19  lead to the discovery of admissible evidence.  It is simply not

12:36:22  20  logical and not consistent with, you know, the most basic

21  understanding of relevance for discovery purposes to suggest

22  that all of that is off limits.

23         That aside, again given that we're not talking about

24  independent agreements or actions taken pursuant to independent

12:36:44  25  conspiracies, I don't think you can, as a practical matter,

1    draw the kind of line that they apparently want to draw.  I

2    don't know that you can neatly separate out materials,

3    deposition questions, discovery generally, between something

4    that relates, for example, to the attempt to deny clearing

12:37:06    5    services from what was going on before the CFTC.  They were all

6    happening at the same time, they involved the same individuals,

7    and they were all focused on the same objective.

8         There is an easy way forward, and Your Honor has

9    already heard extensive argument on this and there have been

12:37:33    10   several briefs as to this issue.  The defendants produced

11   significant number of documents to the Department of Justice

12   pursuant to civil investigation demand that they issued in

13   connection with their investigation of potential

14   anticompetitive effects of the merger.

12:37:54    15        Defendants' counsel has acknowledged that essentially

16   everything, if not literally everything, within the scope of

17   what they had agreed to give us, back in 2005 or 2006, can be

18   found on those, in that production, which are, as I understand

19   it, in the form of CD's.  They can be delivered to us at

12:38:14    20   essentially an costless basis.  There's nothing to collect,

21   there's nothing to sort.  All they need to do is make a copy

22   and send it to us, we'll pay the shipping.

23        Now, the other nice thing about those CD's is that

24   they can't argue that anything on it is privileged.  By

12:38:33    25   definition, whatever they disclosed to the government has lost

1   any privilege that would otherwise apply.

2          And in addition, we have presented the Court with

3   clear authority that says, regardless of whether the DOJ is

4   obligated to produce information it received in connection with

5   an investigation, there is no impediment to a party, a civil

6   litigant, obtaining those same documents not from the

7   government but from the party that produced it to the

8   government.

9          Legal principles are fairly clear cut.  I'm referring

10  to the NASDAQ case, the Air Passenger case, and I forget the

11  other one, it's in the brief that we filed, docket number 140,

12  I believe.  There's just no reason for a continued debate over

13  our entitlement to those documents.  They are plainly relevant,

14  they're easily produced.  Just having those documents could get

15  us substantially through what would otherwise be an expensive

16  document discovery process.

17          MR. SALZMAN:  Yes, thank you, Your Honor.

18          Your Honor, I just wanted to correct a factual error.

19  It's not on CD's.  They're hard disks, 120 hard disks, I

20  believe is the number.  So it's quite a bunch of material.  But

21  the other thing that I think is at least interesting is that

22  the documents don't just cover the period from October or

23  probably March of 2003 through 2004 or '05, those documents go

24  all the way through 2007, 2008 when the merger was completed

25  when the Department of Justice ruled that it could go forward.

1        I also, just as long as we're doing things for the

2    record, I don't actually care for the characterization of

3    shenanigans before the CFTC because they weren't.  They were

4    serious efforts and the result of the CFTC requiring them to

12:40:59    5    actually file a complete application, which wasn't completed on

6    the 29th of January, one day before they were approved.

7        Yes, we have those documents.  We've never said that

8    we can't produce them because we gave them to the Department of

9    Justice.  That's a silly argument.  We try not to make silly

12:41:19    10    arguments.  But we would suggest that most of them are

11    irrelevant, or at least for a substantial period of time, and

12    the others we don't know how relevant they are because the

13    Department of Justice required us to put in all of our business

14    plans which is what are in those documents which is why we've

12:41:40    15    been a little reluctant to -- more than a little reluctant,

16    quite reluctant to just give over the whole thing.

17        With respect to privilege, yes, they were all reviewed

18    for privilege and they were all produced to the Department of

19    Justice, but I have to look at the order to see if we have a

12:41:54    20    clawback in case there was something in there that was

21    privileged.  I just don't remember that, Your Honor.

22      (Brief pause).

23        MR. SALZMAN:  I just don't remember whether there was

24    a clawback.

12:42:05    25        MR. QUINN:  Two things very briefly.  First, the silly

1  argument that defendants never made about governmental immunity

2  being a basis for them not having to produce their documents.

3  It appears at docket number 182, from pages 5 through 9; silly

4  argument they never made.

12:42:22  5  Mr. Salzman made the point there may be documents

6  within the DOJ production that are outside the agreed scope of

7  discovery here that are otherwise irrelevant.  That may very

8  well be true.  I will, therefore, just repeat an offer that we

9  made several years ago when we first started talking about

12:42:43  10  this, which is, they want to harvest from that larger

11  production the documents that are relevant to this case, then

12  we wouldn't object to that provided it doesn't have the effect

13  of extending out the ultimate trial in this case by even more

14  months, and further provided that they do give us everything

12:43:07  15  that's relevant in what they previously agreed to produce.

16  MR. SALZMAN:  As a search database, that's fine.  I

17  mean, it's enormous, but we ought to be able to figure out some

18  way to search it for relevant time period and for relevant

19  documents.  That still means, Your Honor, that we have to

12:43:26  20  understand what's really relevant at this point in this case,

21  which would mean I still think they should come up and tell us

22  what the issues are.

23  Is he really saying stuff we did that failed to have

24  any impact on anybody is an issue in this case?  Because it

12:43:46  25  sounded like it.  Yes, the Board of Trade made an effort to

1    deny them access to the Board of Trade Clearing Corporation,

2    but it failed.  We objected to NFA's providing certain services

3    to them on the ground that it was contrary to their certificate

4    of incorporation.  It failed.  Nobody is alleged to have been

12:44:08    5    impacted by those actions.  Why are they relevant to this case?

6              THE COURT:  What I think plaintiffs' counsel is after

7    is the proposition that if there's a conspiracy to -- well,

8    let's take it out of this particular case.  A conspiracy to

9    murder a competitor, a human being.  The competitor eventually

12:45:07    10    gets murdered.  Are you entitled to get discovery that on

11    several other occasions there was an attempt to murder the

12    competitor that failed?  This ordinarily shows intent, but one

13    of the basic problems in this case from the very beginning,

14    which I've reiterated, is if one is trying to prove that the

12:45:39    15    defendants in this case wanted Eurex to fail, I would be

16    shocked to learn that there was evidence that this was not

17    true.  This is a potential competitor seeking to enter the

18    market, you're better off without the competitor.  The issue

19    always is, if you assume their intent, that they can find their

12:46:09    20    protest and the roadblocks, the things that they are legally

21    entitled to do.

22              MR. SALZMAN:  Which is why we brought the motion for

23    summary judgment because there is no evidence that any party

24    dealing with them was impacted by anything we did.

12:46:24    25              THE COURT:  So, actually, in my view, we've gotten

1    closer.  One of my major problems in this case from the very

2    beginning is that there are tons of paper, it's very difficult

3    to sort them because there were legal purposes to be served

4    that may very well have damaged the plaintiff in this case, but

12:47:12    5    they're legal.

6               MR. SALZMAN:  Correct.

7               THE COURT:  And what I think the plaintiff would be

8    most interested in are not discussions about the general

9    undesirability from the commercial perspective of the

12:47:41    10    defendants.  The commercial undesirability of having Eurex open

11    and succeed doesn't get you very far unless you can pin

12    something that was first something they were not entitled to

13    do, and second, that it had some deleterious effect.

14               It's difficult to imagine that there's an awful lot of

12:48:21    15    stuff in what they sent the DOJ that reflects on this.  There

16    were other reasons why they file stuff with DOJ.  And, in all

17    honesty, some of it is filed with DOJ and the institutional

18    premise of DOJ that if you give us everything, even if we don't

19    really need it and even if we may never look at it, no one can

12:48:48    20    say we didn't get everything.  And, frequently, it's in the

21    interest of the person that's providing this stuff to give them

22    as much as possible.  Some people think in the hope that if you

23    give them enough, they won't be able to read it all, and some,

24    even if they're going to read it all, may be buried in data.

12:49:12    25    But the fact is is that I've said this before, what the result

1  that they got, if you regard what happened to Urex as a

2  failure, the result that they got is a result that they

3  probably wished for and hoped for. Whether they did it and

4  caused it to occur is another issue entirely, which is why I

12:49:44  5  have insisted on focusing in discovery on things that they

6  actually did.

7  So I thought the last thing you would need to know in

8  order to prove this case is that they wanted Eurex to be

9  unsuccessful. So what you really have to prove is that they

12:50:13  10  did certain things that had or reasonably would have had some

11  kind of impact. The way I talk about reasonably would have had

12  impact is assuming we get to -- for example, if you establish

13  beyond a doubt that they caused Eurex four days of opening on

14  the market, and that's all they caused, forget the other

12:50:46  15  related stuff, we have some question as to what this case might

16  possibly be worth. But I always thought in the beginning you

17  had to focus on finding out what it was that they did as

18  opposed to finding out that which you already know, and that's

19  what happened to Eurex.

12:51:16  20  And there might be stuff in the DOJ files that might

21  be of use to you. I sort of doubt it because of the nature of

22  those filings and of the way they're filed and of the review

23  given to those files, but from the very beginning I thought

24  that this was a problem.

12:51:40  25  Now, it's a problem that would be easily overcome if,

1  for example, you had some witness who came forward and said, "I

2  had a lot of business with the Board of Trade, I had a lot of

3  business with CME, one or the other or both, and these two

4  guys, these two goons from the Board of Trade or CME came over

12:52:06    5  and said we're going to screw up your accounts, we're going to

6  limit your access, we're going to do lots of bad things if you

7  are to have even one trade on Eurex." Great evidence. But I

8  think in the beginning there was a distinct impression I got

9  that the belief of the plaintiffs was that they weren't finding

12:52:32   10  such witnesses. Not only were they not finding such witnesses,

11  they were probably of the belief that the reason they weren't

12  finding these witnesses is because the Board of Trade and CME,

13  the defendant, intimidated the witnesses, which is again the

14  kind of thing that would be helpful to you, but that seems to

12:52:53   15  be gone. The possibility seems to be gone, the witnesses

16  aren't coming forward.

17        So what we got is very subtle acts that it is claimed

18  to have big effects. And it seems to me that what the Board of

19  Trade and CME have to do that would be illegal has to be

12:53:26   20  influenced on the actions of others. So it can't entirely be

21  hidden. If some witness somewhere, some person somewhere--and

22  in the case of this, many persons--would have been able to say,

23  "well, this is what the Board of Trade told us, this is what

24  CME told us, this is why we did what we did, we didn't want to

12:53:51   25  do it but we were afraid," this dropped out of the case very

1  early.  And, in fact, there were complaints offered by

2  plaintiffs' counsel that they couldn't get that stuff because

3  everybody is keeping their mouth shut.

4        Okay, and if the suspicions of the plaintiff here are

12:54:11   5  correct, it's a very unfortunate thing, but proof is proof, and

6  I didn't see any evidence that you were getting there.  What I

7  see is pursuit of a lot of evidence that the Board of Trade and

8  CME probably thought this would be a better world for them

9  without Eurex.  This is not a criminal intent, nor is it a

12:54:43  10  criminal hold.

11        What I would like the CME and the Board of Trade to do

12  is, and I realize there may be a certain expense, I'd like to

13  start taking a look at what it is they gave DOJ and start

14  talking about what might be privileged and what might not be

12:55:08  15  privileged and what is clearly not relevant, because it will

16  help me in one way, I won't be discussing this in the highly

17  theoretical way that I've just done, which is essentially

18  unattached to any fact in this case, because what I have is one

19  side saying there's all this stuff there, people haven't seen

12:55:31  20  the stuff, and the other side saying it's privileged, it

21  doesn't do you any good, and a variety of other things.  You're

22  not going to reach agreement on what this is, and usually when

23  that happens I'd like to see some of it.

24        MR. SALZMAN:  Can I say two things, then?  Early on in

12:55:52  25  the case we tried to work out a sensible search term list --

1          THE COURT:  I remember that.

2          MR. SALZMAN:  And I would say Speaker Boehner and the

3   President are doing better negotiating than we did.  So it

4   wasn't very successful.

12:56:13   5          If we have a search term list and a date when it makes

6   sense, we can start doing tests on some of the hard drives and

7   see what comes up.

8          THE COURT:  And bear one thing in mind, my standard

9   here is not that it be complete, my standard here is that it be

12:56:35   10  a fair enough sample that I can look at it and make some kind

11  of judgment.

12         MR. SALZMAN:  Which makes -- I've seen a lot of courts

13  out in Delaware and New York are starting to do things like

14  that with electronic discovery, which makes quite a bit of

12:56:50   15  sense.

16         The other thing I think the Court should know is that

17  Eurex is not the last competitor to try to launch these

18  products and to have failed.  Since Urex, there have been two

19  major efforts.  CME and CBOT are not alleged to have done

12:57:10   20  anything to stop them, impair them, impede them, steer away

21  people, and they both failed just exactly the same way Eurex

22  failed.  And it's the same people, the same banks.

23         So to say that these banks are intimidated by CME and

24  CBOT is actually totally unfair since they, first of all, are

12:57:34   25  our biggest customers and we're intimidated by them, and

1  secondly, they keep launching competitors against us.  So it's

2  hard to put this intimidation thing in any kind of light that

3  will stand up.

4  So again, I think it would be fair for us to try and

5  get a list of search terms that will focus on, in some way,

6  efforts to impede or impair anybody from using their market,

7  and we'll run -- you know, we'll pick some numbers at random,

8  pick the hard drives, and see what we get and present it to

9  you, present it to them.

10  THE COURT:  That would be helpful.  And one of the

11  reasons I suggested that there be a sample is because I can get

12  a sample a lot quicker than I can get the whole issue.  You

13  might also wish to raise questions about what you think doesn't

14  count because it's out of the time range.

15  MR. SALZMAN:  Well, I would hope that we can pick the

16  time range that begins at the time when their efforts to enter

17  the market started, somewhere early 2003, and I don't think

18  there's anything that we're alleged to have done past 2005;

19  maybe; nothing I know.

20  THE COURT:  What do you think about those dates?

21  MR. QUINN:  I don't agree with them off the top of my

22  head, Your Honor.  I don't think you can neatly

23  compartmentalize --

24  THE COURT:  Maybe you can discuss that, and I think if

25  they're reasonable, you're not going to get a lot of quarrel

1    from the defendants.

2         With respect to some of the things that were said here

3    today, I'm going to look at my stuff again.

4         MR. SALZMAN:  Thank you.

12:59:33    5    THE COURT:  But you are not to wait until I speak to

6    start the sample.

7         MR. SALZMAN:  I understand that.  Thank you for taking

8    a look.  Appreciate that.

9         MR. QUINN:  May I be heard, Your Honor?

12:59:44    10    THE COURT:  Absolutely.

11         MR. QUINN:  First, in reaction to your remarks.  I

12    agree completely with you that it's no secret, it's undisputed,

13    that CBOT, CME didn't want Eurex to succeed.  I won't deny it.

14    And I also agree that that's not a basis for a liability for

01:00:04    15    anything.  It's not what our case is about.  That may be

16    perfectly legal, it may be perfectly legal to wish for failure,

17    but what's not legal is to join with another party and enter

18    into an agreement to prevent Eurex from succeeding and to do it

19    through unlawful means, that's what we need to prove.

01:00:26    20         And we've now spent I don't know how many years

21    talking about what might be in these documents.  And it sort of

22    turned it on its head, is that we're being put in this position

23    by remarks that have been made is that we somehow have to prove

24    what is in their documents just to make a threshold showing of

01:00:50    25    relevance, we have to prove what's in their documents without

1  seeing them, and I would suggest that is not a sensible and

2  efficient way to move this case forward.

3        With respect to the DOJ documents, Your Honor, I

4  understand why the Court has some skepticism about whether the

01:01:11    5  documents that are on those disks or hard drives, or whatever

6  they are, are important to us.  We have our own views of that,

7  in part because what the DOJ was investigating and was very

8  open about was exactly the same sort of thing that this case is

9  about, it was about anticompetitive conduct focused in

01:01:33   10  particular around the use of common clearing, or to put it

11  differently, using the efficiencies of common clearing, the

12  denial of efficiencies to others, as a means of creating an

13  uneven playing field.  That is something the DOJ was focused

14  on, that is an aspect of our case as to which they sought

01:01:53   15  summary judgment and the Court denied it and the Court said

16  we're entitled to discovery on that.

17        The DOJ also served CID on our client in order to

18  obtain the documents that had been produced in this case,

19  specifically the documents that have been produced in this case

01:02:10   20  which is pretty strong circumstantial evidence that there's

21  actually a great deal of overlap about what the DOJ was looking

22  for, and got, and the evidence that we're entitled to develop

23  in this case.

24        The process that has been suggested strikes me as

01:02:28   25  somewhat vague, but so be it.  It's obviously not what we had

1    in mind when we asked the Court to focus on our motion to

2    compel production of those documents.

3        The whole point was not to -- the whole point was to

4    provide a means of eliminating delay, of moving the case

01:02:49    5    forward, not creating another way of kicking the can down the

6    road another three or four months.  If the defendants are left

7    to their own devises to decide what it is they think is

8    relevant, what it is, you know, they think is important to turn

9    that over in order to kick off three months of discussions

01:03:07    10   about whether these things are meaningful or not, that's going

11   to slow things down.

12       I would ask Your Honor for a ruling on the motion, one

13   way or the other, thumbs up or thumbs down, in part because my

14   client is pressuring me for a ruling on that and I've run out

01:03:24    15   of things --

16       THE COURT:  What, precisely, is it you want me to rule

17   on?

18       MR. QUINN:  On our motion to compel production of the

19   CID production.

01:03:34    20       THE COURT:  We'll give you an order.

21       MR. QUINN:  Thank you.

22       Two other things.  In the Court's decision on summary

23   judgment, it did identify a number of issues as to which, in

24   its opinion, it said we are entitled to take discovery.  Are we

01:03:48    25   now free to proceed with document and other discovery as to

1    those issues?

2           THE COURT:  You mean discovery other than the DOJ

3    papers?

4           MR. QUINN:  Yes.

01:03:58    5           THE COURT:  Okay.

6           Your view?

7           MR. SALZMAN:  I --

8           THE COURT:  Do you want to take another look at what

9    the --

01:04:05   10           MR. SALZMAN:  I mean, I can't say that he's not free

11   to file a discovery request and we'll feel free to object.

12           THE COURT:  Fine.  That way it will be useful.  Are

13   you basically--and I'm not saying you are irrevocably committed

14   to this, we are not applying rules of estoppel--are you

01:04:24   15   basically down to the point that they used clearing as their

16   weapon?

17           MR. QUINN:  No.  No, Your Honor.  No, no.

18           THE COURT:  You have others?

19           MR. QUINN:  Well, actually there were several aspects

01:04:32   20   of it, one was impairment of market readiness by creating an

21   atmosphere of uncertainty.  There were a number of aspects to

22   it.

23           Your Honor, we filed a complaint and the complaint

24   laid out what we were able to allege about the conspiracy based

01:04:47   25   on the information that was available to us.  They challenged

1  the sufficiency of it. The challenge failed. The Court found,

2  we believe rightly, that we have made out a sufficient prima

3  facie case on each of these elements. Since then the Court has

4  ruled that some of the aspects of the conspiracy that we said

01:05:05    5  could be as to liability can't via the Noerr-Pennington

6  doctrine. That has changed, but what hasn't changed is we are

7  seeking to prove that they entered into a conspiracy to destroy

8  Urex, to prevent it from succeeding. We won't know until we

9  get discovery what each act was and whether it does or does not

01:05:26   10  give rise to liability.

11        THE COURT: That's a perfectly satisfactory answer,

12  the problem with that answer is, from my case management

13  perspective, is you file a complaint and it has prima facie

14  validity that they did X, Y and Z, and then let's make it

01:05:44   15  better, they did A through L, got a lot of it. Then the case

16  goes on and there's some discussions and the plaintiff is

17  encountering what I would characterize as difficulty finding

18  evidence as to some of these things, evidence that does not lie

19  solely in the vaults of the defendant. And I got the distinct

01:06:15   20  impression that at least parts of the investigation, at least

21  parts of this case, was not going well for the plaintiff. And

22  it's interesting to me and helpful to me in deciding what to do

23  and what to look at is to see what there might be that is left,

24  what the most promising avenues are. And the reason I said

01:06:48   25  that we're not dealing with estoppel here is if something

1    surfaces that you thought was irrevocably lost and it's now

2    come back to life, fine, but it's useful to me to know

3    precisely what you're putting in money on and what you're not

4    putting your money on.  And if you tell me this is the

01:07:19    5    direction we're going now, it would be helpful to me.  And

6    telling me we had a prima facie complaint with lots of things,

7    bad things that we thought we could prove, it's not going to

8    hurt you to tell me that some of these things are looking

9    brighter and some of them are looking dimmer, and I would like

01:07:44    10    to know which.

11    And bear in mind, it was not the defense that said the

12    plaintiff was having difficulty because people weren't talking

13    to them, that this or that witness is not available, with dark

14    implications about causation of that, that was said to me.  I

01:08:09    15    understand that.  It could be true, maybe it's not true, it

16    could be true.  That's fine.  But from your perspective that

17    where you think the evidence lies, where you think your best

18    bet is or best bets are, that's helpful to me to know that,

19    because otherwise I hear a string of very abstract arguments

01:08:34    20    which enables Mr. Salzman to come back and say to you:  1, that

21    you're all over the map, 2, that you're trying to raise things

22    that have already been resolved, and 3, most important from his

23    perspective, saying, you know, this is really kind of a vague

24    request, we don't see its purpose, this is the reason why it

01:08:56    25    shouldn't be produced, this is the reason why we shouldn't go

1  down that path.

2       I make discretionary decisions based on what I

3  understand the purpose and current viewpoint of the lawyer is,

4  and I need something that has more rather than less specific,

01:09:12   5  and I'm offering you what is seldom offered, you can do it

6  without binding yourself to it.

7       So that's all I said, you don't have to respond to me

8  now.  Either you send me something or you don't send me

9  something.

01:09:26   10       MR. QUINN:  Your Honor, obviously, we have, to a

11  significant degree, engaged in a factual investigation to the

12  extent that it can be done without the benefits of the

13  discovery rules.  And, obviously, I'm not in the position to

14  weigh work product, I can tell you that --

01:09:46   15       THE COURT:  Don't .... put it in writing.

16       MR. QUINN:  Okay.

17       Two other things.  In, I think, at the August 7th

18  conference, I handed up a proposed scheduling order for the

19  Court's consideration.  I have revised that order solely for

01:10:09   20  the purpose of updating the dates to take into account the time

21  that has elapsed since then.  In other words, I just moved the

22  dates up.  I'd like to hand that up and ask that the Court

23  enter it.

24    (Document tendered to the Court.)

01:10:29   25       MR. QUINN:  And then the last thing is, and this is

1  for the record, I believe it was at the August conference that

2  Your Honor requested that we prepare a draft unofficial

3  complaint that laid out what we view as our case in the

4  aftermath of the Court's ruling on summary judgment and then to

01:10:58    5  provide it to them --

6  THE COURT:  Which was another method of what I just

7  said.

8  MR. QUINN:  I just wanted the record to reflect that

9  we did that and we provided that draft unofficial complaint to

01:11:10   10  counsel for the defendants on September 3rd of this year and we

11  haven't received any response to that; not that I was

12  necessarily thinking I'd get one.

13  MR. SALZMAN:  On the proposed scheduling order, since

14  we just were graced with a copy of it, we certainly would like

01:11:31   15  a chance to look at it.

16  THE COURT:  Sure.  Send me a note.

17  MR. SALZMAN:  Yeah, we will.

18  And then, again, the reason we made the motion for

19  summary judgment, and just to highlight the important part of

01:11:45   20  it, we said, Your Honor, accept that we did all of the bad

21  things they say we did, nobody was impacted.  And that still

22  remains, unless he has some new secret information, and if he

23  wants to share it with us we'd be happy to talk about it and we

24  might have a different view of the case, but right now we're

01:12:05   25  sitting with a case where there is no witness who said they

1    were impacted by anything we did.  There is no evidence that

2    anybody was impacted by anything except the experts, and those

3    experts should be disqualified under Daubert because they don't

4    qualify.

01:12:21   5            THE COURT:  And you think I'm leaving this hang?

6                MR. SALZMAN:  I don't wish to say that, Your Honor.

7                THE COURT:  I am leaving it hanging.

8                MR. SALZMAN:  Yes.

9                THE COURT:  And I have a reason which I think works

01:12:32   10   for this case, but there is a period of time when it no longer

11   will work.

12               MR. SALZMAN:  Okay.  Thank you.

13               MR. QUINN:  Thank you for your time.

14               THE COURT:  Thanks.

15       (Which concluded the proceedings had on this date in the

16        above entitled cause.)

17

18                  *    *    *    *    *    *    *    *

19

20

21   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

22        RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

23

24

25    /s/Blanca I. Lara                    date