# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| U.S. FUTURES EXCHANGE, LLC AND<br>U.S. EXCHANGE HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 04 C 6756 |
| v. | ) | |
| | ) | |
| BOARD OF TRADE OF THE CITY OF CHICAGO,<br>INC. AND CHICAGO MERCANTILE EXCHANGE,<br>INC., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs U.S. Futures Exchange, LLC ("USFE") and U.S. Exchange Holdings, Inc. ("UEH") bring this antitrust case against defendants Board of Trade of the City of Chicago, Inc. ("CBOT") and Chicago Mercantile Exchange, Inc. ("CME").[1] Plaintiffs allege that defendants engaged in anticompetitive conduct to block plaintiffs from successfully entering the U.S. Treasury futures and options exchange market. Pending before the Court are: (1) defendants' motion for summary judgment [708]; and (2) plaintiffs' motion for partial summary judgment [712]. For the reasons that follow, the Court grants defendants' motion [708]. The Court denies plaintiffs' motion for partial summary judgment [712] as moot.[2]

---

[1]     During the course of this long-pending litigation, CME merged with CBOT. The new, merged entity created in 2007 is named CME Group.

[2]     This case was originally set for trial on June 4, 2018. On April 27, 2018, after reviewing the parties' summary judgment motions, the Court vacated the trial date

**Background[3]**

**A.     Factual Chronology**

**1.     CBOT's Launch Of U.S. Treasury Futures And Options Trading**

In the 1970s, CBOT created and launched what later became its flagship product: futures contracts on U.S. Treasury notes and bonds. Futures and options contracts can be traded in the United States only on an exchange like CBOT that is approved by the U.S. Commodity Futures Trading Commission ("CFTC") as a designated contract market. R. 742 ¶ 1 (Defendants' Response to Plaintiffs' L.R. 56.1 Statement of Additional Facts).

**2.     CBOT-Eurex License Agreements**

In the 1990s, UEH's parent Eurex Frankfurt AG ("Eurex") developed an all-electronic trading exchange in Europe. *Id.* ¶ 4. CBOT licensed Eurex's electronic

---

and explained that it would "issue a written opinion on the pending motions for summary judgment." R. 753.

[3]     The Court disregards all inappropriate legal arguments in the parties' L.R. 56.1 statements. Plaintiffs' responses to defendants' statements of fact and plaintiffs' statement of additional facts in particular are rife with "legal and factual argument that must be disregarded." *Rao v. Gondi*, 2017 WL 2445131, at *2 (N.D. Ill. June 5, 2017); *accord Ortega v. Chicago Pub. Sch. of the Bd. of Educ. of the City of Chicago*, 2015 WL 4036016, at *3 (N.D. Ill. June 30, 2015) (disregarding "argumentative language as it is improper"). The Court also disregards numerous facts raised by both parties that are not "*material* to the movant's motion." *Wilbern v. Culver Franchising Sys.*, 2015 WL 5722825, at *17 (N.D. Ill. Sept. 29, 2015). And the Court disregards portions of plaintiffs' statement of additional facts that do not contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1. Finally, the Court notes that both parties run afoul of the rule that each paragraph of a L.R. 56.1 statement be "short" and "contain only one or two individual allegations." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Plaintiffs in particular have violated this rule, including through numerous paragraphs in their statement of additional facts that span a page to page-and-a-half of single spaced text, with large numbers of exhibits cited in each. *See* R. 742.

trading platform in October 1999, and the parties signed a non-compete to prevent Eurex from, among other things, offering U.S. Treasury futures itself. *Id.*; R. 731 ¶ 6 (Plaintiffs' Response to Defendants' L.R. 56.1 Statement of Facts). The parties entered into a new license agreement in July 2002. R. 731 ¶ 6. That agreement was set to expire on December 31, 2003, and the non-compete was set to expire on January 30, 2004. *Id.* In early January 2003, CBOT notified Eurex that it intended to terminate the license agreement the day it was set to expire (December 31, 2003). R. 742 ¶ 5.

### 3. Eurex's Plan To Launch USFE As A Competing Exchange

Both CBOT and Eurex made public announcements on January 10, 2003. R. 731 ¶¶ 6-8. CBOT announced that it had entered into a contract to use a different trading platform after December 31, 2003 when its licensing agreement with Eurex expired. *Id.* ¶ 7. And Eurex announced its intent to launch a U.S. Treasury futures and options exchange, USFE, to compete head-to-head with CBOT. *Id.* ¶¶ 2, 8. The planned launch date for Eurex's competing exchange was February 1, 2004, the earliest date possible under the non-compete agreement. *Id.* ¶¶ 6, 8.

While planning for its U.S. launch, Eurex created a business case defining the two most likely outcomes as: (1) winning the entire futures market by 2007; or (2) failing and quickly exiting from the market. *Id.* ¶ 9. The business case assumed a "binary outcome" was most likely because "the nature of . . . the futures business is that [in] any one product, there is a tendency to concentrate the market or liquidity into one market." *Id.* Eurex cited "the 'network effect' of CBOT's large

volume" as a "barrier to entry" into the U.S. Treasury futures market. *Id.* ¶ 10. In a March 17, 2003 presentation, Eurex assessed the probability of USFE's success at "10%, however increasing to 50% if achieving mile-stones." *Id.* ¶ 11. Defendants' executives readily acknowledged the business threat posed by USFE's planned entry into the market, including in light of Eurex's low-cost, all-electronic trading platform (which market participants were familiar with, having used it during the years that CBOT licensed it). R. 742 ¶¶ 6, 8, 16.

### 4. CBOT And Eurex's Competing Clearing Agreements

All futures contracts and options traded on an exchange must be submitted to a clearinghouse for clearing. *Id.* ¶ 1. A clearinghouse is a financial institution formed to facilitate the exchange of transactions. It stands in between the two firms participating in a trade and guarantees all trades it clears, and its purpose is to reduce the risk of a firm failing to honor its obligations. Eurex and CBOT separately began negotiations with two clearinghouses for their competing exchanges: (1) defendant CME; and (2) the Board of Trade Clearing Corporation ("BOTCC"), which was CBOT's prior clearinghouse. R. 731 ¶¶ 12-13. BOTCC was an independent corporation not owned by CBOT.

During CBOT's negotiations with BOTCC, CBOT requested that BOTCC act as an exclusive clearinghouse for CBOT's key products, including U.S. Treasury futures and options, but BOTCC was resistant. R. 742 ¶ 24. Prior to this, CBOT and BOTCC never had a written agreement, and there was no restriction on BOTCC's ability to provide clearing services for other exchanges. *Id.* CBOT encountered less

resistance in its request for exclusivity from CME. *Id.* ¶ 25. In a March 25, 2003 email summarizing the negotiations, CBOT explained: "CME wants flexibility in providing clearing services for other exchanges, however, CBOT would have exclusivity for the core products . . . . Only concern is with respect to anti-trust considerations but CME intent is to grant us exclusivity." R. 733 Ex. 145.

From the time the buyer or seller of a futures contract opens the contract until the counter-party closes it, the contract is considered "open." Contracts that are outstanding at the clearinghouse—*i.e.*, that have not been offset by delivery— are called "open interest." *See* R. 742 ¶ 1. As part of CBOT's negotiations with CME, they debated whether a bulk transfer of open interest from BOTCC to CME would be possible as part of a CBOT-CME agreement. *Id.* ¶ 27. Defendants understood that "interjecting CFTC into the process" by submitting rules for "approval of the CFTC" could reduce risk and "act[ ] as an insulator against liability." *Id.* ¶ 28. Defendants began discussions about this with the CFTC in April 2003. R. 731 ¶ 18.

On April 16, 2003, CBOT entered into a clearing services agreement ("clearing link") with CME set to begin on January 2, 2004. R. 742 ¶ 25; R. 731 ¶¶ 13-14. Under that agreement, CME could provide clearing services for products competing with CBOT products only after first giving 30 days' notice to CBOT, at which time CBOT had the right to terminate the agreement. R. 731 ¶ 14. Although this provision was not framed in terms of exclusivity, construing emails in the light most favorable to plaintiffs supports an inference that defendants had an internal understanding that CME would grant CBOT exclusivity. R. 742 ¶ 25. CBOT

subsequently attempted to acquire BOTCC, but BOTCC refused CBOT's acquisition overture. *Id.* ¶ 26.

On May 20, 2003, USFE and BOTCC signed a letter of intent to enter into a clearing services agreement. R. 731 ¶ 16. The parties dispute the extent to which USFE was already committed to or leaning towards BOTCC at the time defendants announced their clearing link. R. 731 ¶¶ 15-16; R. 742 ¶ 25. USFE and BOTCC's plans raised a concern for defendants that if USFE gained access to BOTCC before open interest was transferred to CME, "CBOT's customers could effectively become Eurex US customers without the need to change any clearing procedures." R. 742 ¶ 27.

### 5. CBOT And CME's Submission Of Clearing Link And Open Interest Transfer For CFTC Approval

Defendants' clearing link agreement required them to "draft and submit to the CFTC for approval rules that provide for the clearing of CBOT products at the CME clearing house . . . and facilitate the transfer of open interest in CBOT [p]roducts from BOTCC to CME." R. 731 ¶ 17. On June 3, 2003, CME submitted a request for the CFTC to approve proposed rules to implement the clearing link. *Id.* ¶ 19. On June 13, 2003, CBOT submitted a request for the CFTC to approve a proposed rule ("Regulation 701.01") requiring transfer of CBOT members' open interest from BOTCC to CME. *Id.* ¶ 20; R. 742 ¶¶ 28, 32; R. 733 Ex. 162.

Although the CFTC had no obligation to publish these rule submissions or to provide an opportunity for public comment, on July 8, 2003, the CFTC made defendants' proposed rule changes available for comment on the CFTC website by

July 14, 2003. R. 731 ¶ 21; R. 742 ¶ 29. This was far shorter than that 45-day review period allowed (but not required) by a commission rule. R. 742 ¶ 29. CBOT had requested quick CFTC approval of the proposed rules in June 2003, citing a provision in the clearing link agreement allowing CME to walk away from the agreement by July 15, 2003. *Id.* However, CME's Board Steering Committee had decided on July 7, 2003 to allow the walkaway provision to lapse. *Id.*

During the review period between July 8 and July 14, 2003, numerous industry participants, including USFE and BOTCC, submitted comment letters. R. 731 ¶ 22. USFE's letter raised antitrust concerns, explaining that "an analysis of the anti-competitive impact of the [open market transfer rule] CB[O]T Regulation 701 under the factors of section 15(b) of the [Commodity Exchange Act ('CEA')] precludes the CFTC from approving it." *Id.* ¶ 23. Other market participants likewise raised competition and market-based concerns in their comment letters. R. 742 ¶ 30. USFE and other market participants also requested that the CFTC extend the comment period. *Id.*

The CFTC did not extend the comment period. On July 15, 2003, CFTC staff provided a 17-page memorandum addressing the proposed rules and comment letters. R. 731 ¶ 24; R. 742 ¶ 32. That memorandum explained that the comment letters had raised the concern that the proposed rules "would violate the obligations of [CBOT] and the Commission in light of the antitrust provisions of the Act," including "Section 15(b)." R. 731 ¶ 24. CFTC staff

> acknowledge[d] that these rules relate to important policy and legal
> issues of market structure and competition that the Commission has

7

been addressing since June, 2002.[4] However, . . . 'despite all the discussion about alternative clearing models embracing choice in one form or another, to-date no alternatives to the use of a single dedicated clearinghouse exist and none have been proposed in an implementable form.

*Id.* ¶ 25. CFTC staff recommended approving the rules, including Regulation 701.01, "[i]n order to move forward to implement the Link in an orderly manner, and to enhance legal certainty concerning the procedures to implement the Link."

*Id.* CFTC staff subsequently explained:

The staff recognizes that the Clearing Services Agreement between CBOT and CME could appear to raise antitrust issues. However, the staff believes that any potential antitrust issues are outweighed by the

---

[4]     In June 2002, the CFTC issued a report describing concerns among industry participants that "competition at the exchange and clearing organization level . . . had not materialized." *Id.* ¶ 31. The CFTC identified "two particular characteristics of the market structure of the futures industry . . . as possible causes: [1] the lack of fungibility of products across exchanges and [2] the lack of common clearing." *Id.* With respect to fungibility of products across exchanges, the CFTC acknowledged the potential benefits of such an approach, but also noted that "the development of new products can require a significant expenditure of capital" and "[m]andating fungibility could decrease the potential reward and therefore decrease the incentive for innovation." *Id.* ¶ 32. With respect to common clearing, the report mentioned potential benefits, and also noted: "Commentators suggested that common clearing could work to heighten competition between exchanges and clearing organizations. However, mandating common clearing would have the effect of subjecting clearing organizations to one another's credit risk involuntarily." *Id.* ¶ 33. The report observed that neither the CEA nor CFTC rules require the CFTC to mandate fungibility or common clearing, but the CFTC intended to organize a roundtable with industry participants to discuss these issues. *Id.* ¶ 34. The CFTC held that roundtable and heard testimony from industry representatives on August 1, 2002. *Id.* ¶ 35. They did not change the model. The CFTC and SEC evaluated these issues again and came to the same conclusion in an October 2009 report, explaining that "futures exchanges ordinarily do not treat contracts listed across markets as 'fungible'" because there are "decreased incentives of a futures exchange to innovate product listings and potential exposure of one clearinghouse to the credit risks of another." *Id.* ¶ 38. The 2009 report further explained that "permitting listing of replica contracts on competing exchanges facilitates 'free-riding' on the first exchange's investment and may decrease incentives favoring innovation." *Id.*

benefits to be gained including potential clearing efficiencies, significant cost savings for members and customers, and systemic risk abatement. . . . On balance, the staff believes that . . . the Commission's approval of the CBOT as DCO would not be inconsistent with the Commission's obligation under Section 15(b) of the CEA.

*Id.* ¶ 29.

On July 15, 2003, the CFTC unanimously approved the clearing link and open interest transfer rules submitted by defendants. *Id.* ¶ 26. The same day, the CFTC issued a press release announcing the approval and stating:

[T]he policy and legal issues involved have been well known to interested parties since they were initially raised at the CFTC Clearing Roundtable held almost a year ago. CBOT, CME, and the Board of Trade Clearing Corporation have consulted widely with their members and the Commission about this project and submitted to the Commission an agreed transition schedule on June 13.

Under the Commodity Exchange Act, the Commission is not obligated to publish rule submissions of self-regulatory organizations. Nevertheless, based upon the many expressions of interest in this matter, the Commission decided to provide a short comment period. . . .

The rules are necessary for the orderly implementation of the Link and will provide continuity of financial integrity and customer protection in the futures markets. The Commission believes that the Link and these rules further the Commodity Futures Modernization Act's goal of supporting innovation in the futures industry.

The Commission's decision was based upon the information before it, including comment letters from several interested parties. The Commission is aware of public and industry interest in related policy issues regarding market structure and competition, and looks forward to hearing more on these issues. The Commission believes, however, that this broader dialogue should not impede the planning necessary to move forward to implement the Link in an orderly manner. The Commission believes it is of paramount importance to enhance legal certainty concerning the procedures to implement the Link.

*Id.* ¶ 27.

### 6. USFE's CFTC Application And Preparation To Enter The Market

Knowing that it needed CFTC approval to become a designated contract market ("DCM") before it could launch, USFE pre-filed its DCM application with the CFTC in July 2003. R. 742 ¶ 15. USFE attended meetings with the CFTC that month to discuss its application. *Id*.[5]

On September 3, 2003, USFE, Eurex, and BOTCC officially entered into their clearing services agreement. R. 731 ¶ 39. That agreement prohibited BOTCC from making USFE's contracts "fungible with contracts traded on exchanges other than [USFE] or Eurex" without prior written consent of USFE. *Id*. If the agreement was terminated, USFE could require BOTCC to "facilitate the transfer of open positions and collateral with respect to [USFE] Contracts as to which [BOTCC] maintain[ed] open positions" to another clearing service provider. *Id*. ¶ 40. In other words, the agreement gave USFE the right to transfer open interest in USFE contracts to another clearinghouse upon termination, just as CBOT had arranged to do with CME. In the wake of USFE's clearing services agreement with BOTCC, CBOT proposed crediting the account of any BOTCC member who became a CME-CBOT clearing link member with "the net book value ($16,628 per share) of up to 150 shares of the clearing member's BOTCC stock." R. 742 ¶ 33; R. 733 Ex. 189.

---

[5] A large volume of U.S. Treasury futures were set to expire in late-March 2004. *Id*. ¶ 13. USFE anticipated that in the month of February 2004, some customers would close out these positions on CBOT, reopen them on USFE, and then trade that open interest on USFE. *Id*. This timeline made the date of USFE's launch important. *Id*. ¶ 14.

Around the same time, USFE entered into a regulatory services agreement with the National Futures Association ("NFA") for the NFA to perform market and trade practice surveillance for USFE for an initial term of three years. R. 731 ¶ 42. Prior to this agreement, defendants made efforts to hamper an agreement between USFE and the NFA, including by arguing that the NFA should be precluded from providing regulatory oversight services to USFE on numerous grounds that were ultimately rejected by the CFTC. R. 742 ¶ 34.

On September 16, 2003, USFE filed its formal DCM application with the CFTC. R. 731 ¶ 44; R. 742 ¶ 16. Shortly after USFE's September 16, 2003 application, defendants pursued separate FOIA requests regarding the application and requested extensions of the CFTC comment period until 45 days after receipt of the requested FOIA documentation. R. 742 ¶ 16.

By regulation, USFE's application was initially eligible for fast-track, sixty-day review. R. 731 ¶ 44; R. 742 ¶ 15.[6] But the CFTC removed USFE's application from fast-track review on October 14, 2003, with the stated intent "to ensure that it ha[d] an adequate opportunity to consider fully the issues presented by [USFE's] application." R. 731 ¶ 44. The same day, the CFTC postponed a hearing on USFE's application originally set for October 16, 2003 before the House Agriculture Subcommittee. R. 742 ¶ 16.

---

[6]     A year later, in November 2004, the CFTC "eliminate[d] the presumption of automatic fast-track review of applications and replace[d] it with the presumption that all applications [would] be reviewed pursuant to the statutory 180-day timeframe and procedures specified in Section 6(a) of the [CEA]" in order "to ensure a comprehensive review of applications and to meet other public policy objectives." R. 731 ¶ 46.

The hearing before the House Agriculture Subcommittee was rescheduled for November 6, 2003. *Id.* ¶ 18. At that hearing, the CFTC Chairman testified that because USFE's application was "large" and "extensive," the CFTC had determined that it would be "very difficult to get to a point where we are comfortable within [the 60 day, fast-track] time frame." R. 731 ¶ 45. But he also testified that the application "include[d] all general information required by our rules to be considered complete." R. 742 ¶ 15.

During the review period, CFTC staff themselves raised numerous issues with USFE, sending over 75 questions (in at least four sets) for USFE to answer regarding its application. R. 731 ¶ 48. The CFTC sent copies of USFE's application to the Federal Reserve and the Department of Treasury on November 3, 2003, and the Treasury and Federal Reserve submitted their comments on December 18 and 19, 2003, respectively. *Id.* ¶ 53.

CFTC also made non-confidential portions of USFE's application publicly available on its website for comment. *Id.* ¶ 49. CBOT and CME separately submitted a series of comment letters raising concerns with USFE's application. R. 742 ¶ 19. Several of defendants' comments focused on discrepancies between USFE's public marketing and what was disclosed in USFE's application. Although the application represented that all USFE-listed contracts would be cleared by BOTCC, USFE was publicly marketing a "global clearing link" that would allow products to be cleared at either BOTCC or Eurex Clearing, the latter of which was not Commission-registered. R. 731 ¶ 50. The application also did not mention a

rebate plan that USFE was publicly marketing. *Id.* ¶ 51. Additionally, defendants raised an issue regarding USFE's one-member Board of Directors. *Id.* ¶ 52.

On December 9, 2003, the CFTC announced that it would hold a hearing on USFE's application on December 17, 2003. *Id.* ¶ 54; R. 742 ¶ 20. Later that day, CME and CBOT submitted nearly identical letters to the CFTC stating that they had previously scheduled meetings that conflicted with the December 17 hearing and requesting that that hearing be rescheduled (a) based on the conflict and (b) to address questions raised at the November 6, 2003 House Agriculture Subcommittee hearing. R. 731 ¶ 55; R. 742 ¶ 20.

The next day, on December 10, 2003, the CFTC cancelled the December 17, 2003 hearing, citing "scheduling conflicts of some market participants." R. 731 ¶ 56. It also reopened the public comment period through December 19, 2003 to respond to questions raised at the House Agriculture Subcommittee hearing. *Id.* ¶¶ 56-57. *Id.* The CFTC received 27 more comment letters in response. *Id.* ¶ 56.

On December 19, 2003, the CFTC sent a letter to BOTCC, Eurex, and USFE regarding "misleading" statements made in a December 16, 2003 joint press release claiming that USFE would launch on February 1, 2004. *Id.* ¶ 58. The CFTC said that the deadline for action on the application was March 15, 2004, and that the CFTC "cannot and has not committed itself to any earlier date . . . , and certainly cannot and has not committed itself to a favorable decision on the application." *Id.*

By early January 2004, CBOT had transitioned to a new electronic trading platform, and defendants had implemented their clearing link and transfer of open

interest, resulting in a $1.4 billion reduction in performance bond requirements for their members and $200 million in reduced security deposits. *Id.* ¶ 72.

On January 23, 2004, USFE submitted to the CFTC revised rules, bylaws, and an LLC agreement relating to its DCM application. *Id.* ¶ 64. USFE submitted a letter to the CFTC on January 26, 2004 committing itself to four "undertakings," including a commitment not to use a non-Commission-registered clearing service like Eurex Clearing without permission (a concern defendants raised in their comments) and a commitment to provide the Commission with one-month notice of "any non-traditional form of incentive program" (another concern defendants raised in their comments). *Id.* ¶ 65.

The CFTC announced on January 27, 2004 that it would hold an open meeting on February 4, 2004 to consider USFE's DCM application. *Id.* ¶ 66. USFE's 30(b)(6) deponent testified that this announcement "was the first time USFE received any indication concerning the timing of the CFTC's decision." *Id.* ¶ 67.

On February 2, 2004, CFTC staff issued a 142-page memorandum recommending approval of USFE's application. *Id.* ¶ 68. Staff observed that with respect to CBOT's concerns about USFE's use of a single-person board, USFE had since amended its bylaws to establish a 12-person board. *Id.*

The next day, on February 3, 2004, CBOT reduced exchange transaction fees for customers trading U.S. Treasury futures. *Id.* ¶ 73; R. 742 ¶ 38. CBOT also negotiated an amendment to its clearing link agreement with CME to lower clearing fees for all financial products for a six-month period. R. 742 ¶ 38.

The CFTC approved USFE as a DCM on February 4, 2004. R. 731 ¶ 69. The CFTC required USFE to comply with its agreed undertakings to use only CFTC-registered clearing organizations (*i.e.*, not Eurex Clearing) and to provide any incentive program to the CFTC for review one month before the proposed effective date. *Id.* The CFTC explained during the approval hearing, "we found nothing in th[e] comments that made us feel [USFE] had not or would not be in compliance with [the criteria for DCM designation] and core principles." R. 742 ¶ 23. The CFTC reviewed each objection raised by defendants and rejected the majority of them as without merit. *Id.*

### 7. USFE's Launch

USFE launched its exchange on February 8, 2004, with BOTCC providing clearing services and the NFA performing market and trade practice surveillance. R. 731 ¶¶ 43, 74. USFE ultimately "failed to capture more than a trivial portion of the market." *Id.* ¶ 74.

### 8. Subsequent Events

In January 2005, CBOT increased average exchange fee rates. R. 742 ¶ 38. In 2007, in the course of evaluating CME's proposed merger with CBOT, the DOJ Antitrust Division conducted an "extensive investigation" of the CBOT-CME clearing link agreement. R. 731 ¶ 36. The DOJ Antitrust Division concluded "that the evidence does not indicate that . . . the clearing agreement is likely to reduce competition substantially" or that the clearing agreement "will foreclose entry by other exchanges." *Id.*

**B.    Evidence Related To Coordination And Intent**

Plaintiffs cite numerous documents and testimony to demonstrate what they characterize as defendants' coordinated "Washington strategy" and intent to stall USFE's launch. Defendants do not meaningfully refute that they engaged in a coordinated effort to try to prevent USFE from taking over the U.S. Treasury futures and options exchange market. Instead, as discussed in more detail below, defendants argue that the actions they took as part of that coordinated effort are lobbying and related efforts immune from antitrust scrutiny.

The principal evidence on which plaintiffs focus includes:

o  On May 23, 2003, CME's Director of Clearing Development sent CME's outside counsel an email titled "?State Ownership of Eurex??," asking whether "there may be some regulatory stumbling blocks that could be thrown up in front of [Eurex]?" in light of the fact that several of Eurex's members are "state-owned and operated banks – subject (I believe) to very close provincial regulation." R. 733 Ex. 70. CME's Director explained that "even small obstacles might be enough to trip them up enough to ensure our success" given USFE's "rather abbreviated window of opportunity to make inroads into U.S. markets," but also noted, "I'm not sure what CME could actually DO in this regard." *Id.*

o  On August 4, 2003, CBOT representatives discussed in an email "the ways in which our product is better," including "(4) we will have the established liquidity and isn't our Washington strategy designed to prolong the Eurex entrance as long as possible." *Id.* Ex. 116.

o  On September 23, 2003, an internal CBOT email described efforts to "throw some big guns around Washington" to "help us at Eurex's expense." *Id.* Ex. 73.

o  On October 22, 2003, CME's Director of Government Relations shared with top CME executives a "CME/CBOT Washington Strategy." *Id.* Ex. 97. This strategy included "Plan A" of meeting "with staff of every member of the House Agriculture committee" to brief them on "five [identified] concerns," with the hope of having "members of the Ag Committee instruct the CFTC not to move forward on the Eurex application until the Committee's policy concerns have been answered," and "[t]o further delay the CFTC process" by

16

considering "asking for a Senate hearing to be scheduled after the first of the year." *Id.* "Plan B" consisted of "secur[ing] statutory amendment in the form of language in the omnibus appropriations bill that would provide that no funding can be used by the CFTC for approval of the Eurex application until a study is conducted on our issues," which would "need to be carried out in an extremely discrete manner." *Id.* Plan B was intended to serve as a "concrete solution for delaying the process." *Id.*

o Defendants followed up on their "Washington Strategy" by meeting with Congressional members of the House Agriculture Subcommittee to discuss concerns with USFE's DCM application. R. 742 ¶ 18. Defendants encouraged members of Congress and their staff to raise defendants' concerns with the CFTC. *Id.*

o At the November 6, 2003 House Agriculture Subcommittee hearing, CME's Chairman explained in his written testimony: "Eurex U.S.'s evident plan was to secure CFTC designation for its empty shell of an exchange and thereafter to 'self-certify' the rules that implement its true business plan in a manner that would escape Commission review and approval . . . . We made a clear case that the fast track process was not appropriate, and the Commission responded accordingly." *Id.* ¶ 17; R. 733 Ex. 68 at 114-15. CBOT's Chairman similarly testified: "I am pleased the CFTC has agreed and decided to disallow fast track treatment of the [USFE] application." R. 742 ¶ 17; R. 733 Ex. 68 at 91-92. CME had provided comments on the draft testimony of government officials and third parties who testified at the November 6, 2003 hearing. R. 742 ¶ 18.

o In a November 18, 2003 letter drafted by CME outside counsel to the House Committee Chairman, CME's outside counsel noted that the November 6, 2003 hearing "had tremendously positive consequences on the scrutiny that is being afforded to Eurex's U.S. application." R. 733 Ex. 111. He also listed remaining concerns, including that "Eurex U.S. would operate as a branch office of Eurex Frankfurt with all of its critical governance, regulatory, operational and clearing functions outsourced to third parties," some of whom "were beyond the jurisdictional reach of the Commission." *Id.*

o On December 9, 2003, CME and CBOT submitted nearly identical letters to the CFTC stating that they had previously scheduled meetings and requesting that the CFTC's anticipated December 17, 2003 hearing on USFE's application be rescheduled. R. 731 ¶ 55; R. 742 ¶ 20. Defendants' counsel has conceded that these letters were the product of coordinated efforts. R. 742 ¶ 20.

o A December 29, 2003 CME powerpoint presentation explained that CBOT set up a "war chest" as part of a "pre-emptive plan to deal with the threat posed

by Eurex's entrance to the U.S. market place." R. 733 Ex. 71 at 1, 3. The powerpoint noted that CME's "desired outcome" that Eurex would be "unsuccessful in establishing a viable business model in the U.S. futures space" and therefore unable "to further proceed to compete directly against CME products." *Id.* at 10.

o CME's Chairman stated in a January 27, 2004 email: "It has come to my attention that the CFTC will hold a public vote on the Eurex application . . . on February 4. . . . I suspect this will come as no surprise that the vote will probably pass. But, I wanted to remind the Board of what I said at the last meeting. Because of our efforts, Eurex will not be able to implement any cross border clearing link without approval and that is not in this application. . . . It is due to our efforts that we will get exactly what we want and not what Eurex wants, that is, to compete on a level playing field." *Id.* Ex. 133.

o CBOT's Chairman acknowledged at his deposition that "the longer it takes for the DCM application to be ruled on, whether it's a denial or an approval, that's good for . . . CBOT." *Id.* Ex. 24 at 194:5-10.

## C.    Evidence Related To Causation

Just before and after USFE's launch, USFE executives observed that CBOT's price cuts stole momentum and eliminated USFE's competitive advantage. R. 731 ¶¶ 73, 75-80; *see, e.g.*, *id.* ¶ 78 (USFE executive on April 24, 2004: "[T]he market got what it wanted: Lower prices and an irreversible trend towards electronic trading. Given all this, no one has an economic reason at the moment to use Eurex – US"); *id.* ¶ 80 (USFE executive in 2006: "[USFE] offered the same products, with much less liquidity, on an inferior platform, with a market model that was no longer unique"). Relying on these observations by USFE executives and defendants' expert testimony, as well as the fact that USFE's launch occurred only seven days after the planned date, defendants attribute USFE's failure to legitimate competition, including CBOT's new, more efficient electronic trading system and CBOT's price cuts that eliminated USFE's competitive advantage.

Plaintiffs, on the other hand, attribute USFE's failure to delay tactics on the part of defendants, which they claim resulted in traders not being technologically ready or able to trade with USFE at its launch. R. 742 ¶¶ 39, 40. Plaintiffs rely on documents indicating that potential customers delayed because of regulatory uncertainty surrounding CFTC approval of USFE's application, as well as testimony from plaintiffs' expert. *Id.*

## D.    Procedural History

This case was originally filed before Judge Zagel in October 2004. R. 44. On July 2, 2010, Judge Zagel granted defendants' motion for partial summary judgment on plaintiffs' predatory pricing theory (filed while discovery was ongoing). R. 416. Judge Zagel concluded:

> CBOT has put forth uncontested facts to show that its prices for U.S. Treasury derivative exchange services exceeded its average variable cost . . . [and] also its average total cost. Accordingly, I find that Defendants' pricing was above every measure of cost appropriate for a predatory pricing analysis and grant Defendants' motion for summary judgment on the issue of predatory pricing.

*Id.* at 6.

Two years later, on August 3, 2012, Judge Zagel granted in part and denied in part another motion for partial summary judgment by defendants (again filed while discovery was ongoing). R. 445. In that motion, defendants tested three of plaintiffs' remaining theories of liability. Plaintiffs' first theory was that defendants obstructed the regulatory approval process in order to hamstring USFE's launch. Judge Zagel found this theory foreclosed by the *Noerr-Pennington* doctrine, which "extends absolute immunity under the antitrust laws to businesses and other

associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011). Judge Zagel found that "in weighing USFE's DCM application, the CFTC was acting in a legislative capacity," and that defendants' efforts to influence the CFTC were shielded by *Noerr-Pennington* immunity. R. 445 at 7.

On a motion for reconsideration, Judge Zagel afforded plaintiffs a narrow opportunity to proceed on their regulatory delay theory. He concluded that "it was error not to consider Defendants' [December 9, 2003] letters to the CFTC separately from the other lobbying activity." R. 460 at 1. The Supreme Court in *City of Columbia v. Omni Outdoor Advertising Inc.*, 499 U.S. 365 (1991), stated that "[t]he 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving the denial of the license but simply in order to impose expense and delay." *Id.* at 380. Judge Zagel found that this example was "very close to what Plaintiffs allege here—that Defendants requested a change in the CFTC hearing date strictly to impose expense and delay"—and allowed plaintiffs' regulatory delay theory to proceed on that basis. R. 460 at 2.

Plaintiffs' second theory addressed in Judge Zagel's August 2012 partial summary judgment order was that defendants prevented USFE from securing

competitive clearing services. R. 445 at 9. Judge Zagel explained that "[u]nder Section Two of the Sherman Act, otherwise lawful activity may be rendered unlawful if it is accompanied by a 'specific intent to accomplish the forbidden objective.'" *Id.* (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985)). Judge Zagel held that more discovery was required before intent and causation of injury with respect to this theory could be resolved. *Id.*

Plaintiffs' third theory was that defendants interfered with plaintiffs' customer relationships through a campaign of threats and misinformation. Judge Zagel explained: "Plaintiffs have had considerable difficulty finding traders who will support the[se] claims. . . . However, it is still possible that evidence exists in Defendants' own files." *Id.* at 10. Judge Zagel found that plaintiffs should have "full opportunity to examine appropriate documents in Defendants' possession." *Id.*

In March 2017, this case was reassigned from Judge Zagel to this Court. R. 610. In March 2018, defendants moved for summary judgment as to all of plaintiffs' claims (R. 708), and plaintiffs moved for partial summary judgment on the issues of the relevant market definition and CBOT's monopoly power (R. 712).

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light

most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In the field of antitrust law, summary judgment serves a vital function—it avoids wasteful trials and prevents lengthy litigation that may have a chilling effect on pro-competitive market forces." *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). "[T]he very nature of antitrust litigation encourages summary disposition of such cases when permissible." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir. 1988). Although there is not a heightened summary judgment standard in antitrust cases, an antitrust claimant must "present evidence that tends to exclude the possibility that the [defendants'] conduct was as consistent with competition as with illegal conduct" to survive summary judgment. *Mercatus*, 641 F.3d at 856.

## Analysis

Plaintiffs assert antitrust claims under §§ 1 and 2 of the Sherman Act, alleging a conspiracy by defendants in restraint of trade and anticompetitive conduct by CBOT to preserve its monopoly, as well as a claim under Illinois law for

tortious interference with prospective economic advantage. Section 1 of the Sherman Act "prohibits '[e]very . . . combination . . . or conspiracy . . . in restraint of trade or commerce,' though courts have long restricted its reach to agreements that unreasonably restrain trade." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (quoting 15 U.S.C. § 1). A § 1 claim has three elements: "(1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that [the plaintiff was] injured." *Id.* Section 2 of the Sherman Act proscribes monopolization and attempted monopolization. 15 U.S.C. § 2. Section 2 does not make monopolies illegal, but rather forbids the exercise or pursuit of monopoly power through improper means. *Mercatus*, 641 F.3d at 854. To prevail on a § 2 claim, a plaintiff must show "(1) that the [defendant] possessed monopoly power in that market; and (2) that the [defendant] willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident." *Id.*

As a threshold matter, plaintiffs argue that defendants' alleged conspiracy cannot be viewed by looking only at its component parts, and instead must be viewed as a whole. Plaintiffs rely primarily on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), which directed against "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" in judging "the character and effect" of an antitrust conspiracy. *Id.* at 699. Plaintiffs say that conduct immunized by Judge Zagel's prior summary

judgment order based on the *Noerr-Pennington* doctrine is therefore properly considered in assessing the overall character and effect of defendants' conduct. And plaintiffs advocate for a wholistic view of the evidence in assessing whether a denial of summary judgment is warranted.

It is true that courts generally view allegations of antitrust conspiracy as a whole to judge the character of the conspiracy and intent. *See id.*; *see also Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (error to isolate aspects of a "multi-faceted conspiracy" and fail to consider allegations concerning "conspiratorial motive and intent" "as parts of the whole conspiracy"). It is also true that conduct immunized from antitrust liability is still admissible to show the purpose and character of non-protected conduct. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 462 F. Supp. 1072, 1084 (N.D. Ill. 1978); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1999) (district court "erred in treating the [*Noerr-Pennington*] doctrine as a rule of evidence").

But as the Seventh Circuit explained when interpreting *Continental Ore* in *Mercatus,* the principle that a plaintiff "should be given the full benefit of [its] proof" under *Continental Ore* "does not mean . . . that we will aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized. This approach would nullify the immunity." *Mercatus*, 641 F.3d at 839. "For that reason," a court on summary judgment "must first identify any conduct that is immunized," and after doing so, "consider the evidence of the *remaining*

challenged conduct in the aggregate to see if it is sufficient to support antitrust liability." *Id.* (emphasis added).

Additionally, as other courts interpreting *Continental Ore* have made clear, separate theories of antitrust liability still must be assessed individually. *See, e.g.*, *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) ("*Continental Ore* did not hold . . . that the degrees of support for each legal theory should be added up. Each legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant facts."); *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1042 (E.D. Pa. 2016) ("*Continental Ore* focuses on the use of evidence. . . . Subsequent decisions have acknowledged that the holding in *Continental Ore* was not intended to limit a court's individual assessment of the legality of the various components of an alleged conspiracy."). Indeed, plaintiffs themselves treat their theories as individual "claim[s]" and analyze them separately. *See, e.g.*, R. 732 at 10. The Court therefore addresses each of plaintiffs' remaining theories of liability in turn.

Plaintiffs' four remaining theories of antitrust liability under the Sherman Act are: (1) that defendants engaged in sham petitioning to create regulatory delay; (2) that defendants deprived plaintiffs of liquidity through (a) their clearing link and (b) the transfer of open interest from BOTCC to CME; (3) that defendants interfered with plaintiffs' customer relationships through a campaign of threats and public misinformation; and (4) that defendants interfered with plaintiffs'

relationships with BOTCC and the NFA. Plaintiffs' Illinois tort claim is based on the same allegations underlying their fourth antitrust liability theory.

## I. Regulatory Delay Theory

Plaintiffs' first theory is that defendants engaged in sham petitioning to delay USFE's DCM application, which resulted in lack of market readiness at the time of USFE's launch and ultimately caused USFE to fail. Despite plaintiffs' mischaracterizations of Judge Zagel's reconsideration order (*e.g.*, *id.* at 21-22), Judge Zagel's ruling in fact left only a small window open for plaintiffs to pursue this regulatory delay theory. *See* R. 460. That window is based on defendants' December 9, 2003 letters to the CFTC. *Id.* Defendants now attempt to shut that small window for two independent reasons: (1) defendants argue their scheduling letters are protected petitioning activity under *Noerr-Pennington* and do not qualify under the "sham" exception to that doctrine; and (2) defendants argue plaintiffs cannot show any antitrust injury resulting from the letters.

### A. *Noerr-Pennington*

#### 1. Key Principles Of *Noerr-Pennington* Doctrine And Seventh Circuit's *Mercatus* Decision

As explained above, the *Noerr-Pennington* doctrine extends absolute antitrust immunity to "businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus*, 641 F.3d at 841. The immunity is extended "in part because the original purposes of the Sherman Act did not include regulating political activity and in part because it is questionable whether the First

Amendment allows such regulation." *Premier Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 371 (7th Cir. 1987). As the Seventh Circuit in *Premier Electric* explained, "people are free to try to persuade their representatives that monopoly is preferable." *Id.*

The Seventh Circuit's interpretation of the *Noerr-Pennington* doctrine in *Mercatus* has important implications for this case. *Mercatus* involved a "multi-pronged campaign" to prevent displacement of a monopoly hospital by a "huge threat" from Mercatus, a competitor. 641 F.3d at 837. This campaign involved lobbying local board members, "a public relations campaign," making "derogatory statements" about the competitor to healthcare providers, and offering physician practice groups incentives not to move their practices. *Id.* at 837-38. Despite finding some of this conduct "dishonest or distasteful," *id.* at 857, the Seventh Circuit held that the district court had properly granted summary judgment on the plaintiff's antitrust claims based on *Noerr-Pennington* and other grounds.

A key principle emerging from *Mercatus* is that "many kinds of conduct may prevent or discourage a potential competitor from entering a particular market," but "[f]ederal antitrust laws are only implicated when that conduct is predatory or unjustifiable." 641 F.3d at 854. The *Mercatus* court concluded that the defendant hospital in that case had not used unjustifiable means. "Even if the Hospital had monopoly power in the geographic and product markets Mercatus' economic expert endorsed, the Hospital had no duty to step aside and allow Mercatus to make off with its physicians, patients, and revenue"; "[i]t would be perverse if Mercatus'

failure to prevail *in that competition* gave it a grievance cognizable under the Sherman Act." *Id.* at 857.

As the *Mercatus* court explained, "the sham exception" to *Noerr-Pennington* immunity—the exception invoked by plaintiffs in this case—allows the antitrust laws to reach otherwise protected First Amendment activity in two narrow contexts: "(1) sham lawsuits; and (2) fraudulent misrepresentations." *Id.* at 842; *see also E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) ("[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified").

The Seventh Circuit in *Mercatus* held that the fraudulent misrepresentation prong of the sham exception "is based on the Supreme Court's desire to protect the integrity of non-political governmental proceedings" and therefore "*does not apply at all outside of adjudicative proceedings*"—in other words, even deliberate lies to legislative bodies are immunized under *Noerr-Pennington*. 641 F.3d at 844 (emphasis added). The *Mercatus* court laid out a multi-factor analysis for determining when a proceeding qualifies as adjudicative or legislative. *Id.* at 844-46. Applying those factors in that case, the *Mercatus* court concluded that "the Village Board acted in a legislative capacity when it declined to approve the proposed Mercatus physician center." *Id.* at 847-49. The court therefore held that the fraudulent misrepresentation exception invoked by Mercatus could not apply as

a matter of law. *Id.* And Mercatus did not allege a sham lawsuit for purposes of the second prong of the exception. The *Mercatus* court therefore found that the district court properly granted summary judgment on the "antitrust claims based on the Hospital's activities during the Village Board proceedings." *Id.* at 849.

## 2. Application Of *Noerr-Pennington* Here

Plaintiffs do not ask the Court to revisit Judge Zagel's holding that the CFTC proceedings that defendants sought to influence were legislative, not adjudicative. This Court agrees with that holding based on the factors laid out in *Mercatus*. This means that under *Mercatus*, plaintiffs cannot invoke the fraudulent misrepresentation prong of the sham exception to antitrust immunity under *Noerr-Pennington*. *See id.* at 844 (the fraudulent misrepresentation prong "does not apply at all outside of adjudicative proceedings").

Defendants argue that the other prong of the exception—described in *Mercatus* as the "sham lawsuits" prong (*id.* at 842)—does not apply in the legislative context either. As defendants point out, the Seventh Circuit in *Mercatus* said "sham lawsuits"—not "sham proceedings." Defendants claim this choice of words means that the "sham" prong, like the fraudulent misrepresentation prong, does not apply at all in the legislative context. As defendants point out, a contrary conclusion "would . . . lead to the anomalous result that *Noerr-Pennington* immunizes deliberate lies to the CFTC and Congress [in legislative proceedings], but leaves unprotected petitioning through the ordinary channels of legislative and regulatory process" as long as they qualify as a baseless "sham." R. 739 at 4. Indeed,

prior to *Mercatus*, plaintiffs alleged a fraudulent misrepresentation theory (R. 56 ¶¶ 46-47), but after *Mercatus* and Judge Zagel's rulings that the CFTC proceeding was legislative, plaintiffs now describe defendants petitioning as a "baseless" sham proceeding rather than as "fraudulent misrepresentation." It makes little sense to allow a claim to survive based on a simple change of adjectives like this.

Nevertheless, the Court finds that by using the term "sham lawsuits," the Seventh Circuit in *Mercatus* likely did not mean to entirely foreclose antitrust actions based on pure procedural abuse in the legislative context. Dicta in several Supreme Court cases supports that the sham exception could apply to baseless legislative proceedings. *See City of Columbia*, 499 U.S. at 380 (sham exception could encompass "the filing of frivolous objections to the license application of a competitor"); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 n.4 (1988) ("in whatever forum, private action that is not genuinely aimed at procuring favorable governmental action is a mere sham that cannot be deemed a valid effort to influence government action").

But there is no question that if the sham exception does apply in the legislative context, it is "extraordinarily narrow." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998); *see also Mercatus*, 641 F.3d at 842 (citing *Kottle* approvingly for other propositions); *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1155 (E.D. Cal. 2017) ("The scope of the *Noerr–Pennington* sham exception depends on the branch of government involved. If the relevant petitioning activity involves the legislature, the sham

exception is extraordinarily narrow.") (citations omitted); I. Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 203 (4th ed. 2019) (noting that, in the context of legislative petitioning, "it is virtually impossible to identify the sham"). Although a number of courts have mentioned the possibility of a legislative sham, plaintiffs cite no court of appeals case actually applying that exception to find legislative petitioning to be a sham. *See* R. 732 at 18-19.

To fit within the extraordinarily narrow confines of a legislative sham exception, plaintiffs first must pass a significant threshold: showing that defendants' conduct was objectively baseless. Addressing the sham standard in the (not so narrow) context of meritless lawsuits, the Supreme Court in *Prof'l Real Estate Inv'rs v. Columbia Pictures Indus.*, 508 U.S. 49 (1993), "reject[ed] a purely subjective definition of 'sham'" that would "undermine, if not vitiate, *Noerr.*" *Id.* at 60. The *PRE* Court held that courts must first determine whether activity is "objectively baseless in the sense that no reasonable [party] could realistically expect success on the merits." *Id.* Only where the challenged activity is "objectively meritless may a court examine . . . subjective motivation." *Id.*

Objective baselessness is routinely decided as a matter of law on motions to dismiss and summary judgment. R. 710 at 12 n.9 (collecting cases); *see, e.g.*, *Associated Bodywork & Massage Professionals v. Am. Massage Therapy Ass'n*, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995) (granting motion to dismiss where plaintiff failed to allege plausibly that defendant "had no reasonable expectation of obtaining the favorable legislation").

Plaintiffs argue that the *PRE* standard does not apply here, and that a more flexible test set forth in *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), applies because defendants engaged in a pattern of petitioning. Plaintiffs therefore claim that objective baselessness is not a threshold requirement. But *PRE* clarified *California Motor* and the boundaries of "the sham exception," stressing that the assessment of "sham petitioning must be resolved according to objective criteria." 508 U.S. at 59-60. Post-*PRE*, the Seventh Circuit has not recognized a different standard for "pattern[s]," *see Mercatus*, 641 F.3d at 842 n.3, and other courts of appeals have done so only in the adjudicatory context, including where a defendant has brought multiple lawsuits. *See, e.g.*, *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994) ("twenty-nine lawsuits" not a sham where fifteen of them proved successful; reconciling *California Motor* and *PRE* as dealing with "different situations"—*California Motor* with "the filing of a whole series of lawsuits" and *PRE* with the filing of "a single" lawsuit); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180-81 (3d Cir. 2015) (four frivolous lawsuits); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 364 (4th Cir. 2013) ("series of legal proceedings"); *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 101 (2d Cir. 2000) ("voluminous" pre-litigation challenges).

This case does not involve the filing of numerous lawsuits—it involves a single legislative proceeding (*i.e.*, the CFTC proceeding seeking approval of USFE's

DCM application). Therefore, the Court finds that *PRE's* objective baselessness standard applies.

### a. Objective Baselessness

Again, "in the legislative context," the sham exception to *Noerr-Pennington* immunity is "extraordinarily narrow," "virtually impossible," and requires a showing of "no expectation of obtaining legitimate government action." *E.g.*, *Occidental*, 235 F. Supp. 3d at 1155; *see also PRE*, 508 U.S. at 60-61 (in context of lawsuits, defining objective baselessness to mean that "no reasonable litigant could realistically expect success on the merits"). That is not what the evidence shows here.

Defendants correctly argue as a threshold matter that the December 9, 2003 scheduling letters cannot be considered objectively baseless because they succeeded in obtaining legitimate government action. The letters asked the CFTC to: (1) reschedule the December 17 public hearing on USFE's application so defendants' principals could participate (citing previously scheduled board meetings on December 16, "follow-up special strategy meetings" for CBOT on December 17 and 18, and "meetings with CME clearing firms and other CME customers in New York" for CME on December 17 and 18); and (2) respond to questions raised by House Agriculture Subcommittee members on November 6, 2003. R. 731 ¶ 55; R. 733 Exs. 120-121. The CFTC responded favorably to both requests. The CFTC explained that it was cancelling the December 17 hearing based on "scheduling conflicts of some

market participants," and it replaced the public hearing with a new comment period to respond to questions raised at the House hearing. R. 731 ¶¶ 56-57.

Defendants further argue that the letters were not objectively baseless because they reflected a true scheduling conflict that prevented defendants from attending the hearing, which they had a clear interest in attending. Plaintiffs dispute whether there is evidence of an actual scheduling conflict, saying there is no evidence the conflicts described in the letters actually happened. To begin, however, even if statements in the letters were false, false representations are fully insulated in the legislative context under *Mercatus*.

Moreover, plaintiffs misrepresent the facts. In support of their claim of a genuine scheduling conflict (R. 731 ¶ 55), defendants cite: (1) an internal CME email on October 22, 2003 to numerous CME executives titled "December 16, 2003 Board Meeting" that describes event details (R. 718 Ex. 69); (2) a November 19, 2003 internal CBOT email explaining "The December 2003 Board of Directors meeting will be held on Tuesday, December 16, 2003" (*id.* Ex. 70); (3) December 16, 2003 CME board meeting minutes (*id.* Ex. 71); (4) December 16, 2003 CBOT board meeting minutes (*id.* Ex. 72); (5) an itinerary for a CBOT executive's speaking event in New York from December 15-17 (*id.* Ex. 73); and (6) deposition testimony from a CME employee describing the long-scheduled December 16 CME board meeting in New York, followed by client visits and receptions involving "[a]lmost the entire board" on December 17 and 18 (*id.* Ex. 74 at 264:18-266:16).

Clearly, the board meetings were long scheduled and took place on the December 16 date listed in defendants' letters. And there is unrefuted evidence that follow up CME meetings took place on December 17 and 18. The exhibits do not appear to corroborate the "follow-up special strategy meetings" on December 17 and 18 mentioned by CBOT in its letter, but it is clear that at least one CBOT executive was tied up in meetings in New York during those days.

Plaintiffs emphasize that defendants' letters are nearly identical, and that defendants' counsel has conceded the letters were the product of coordinated efforts. But that does not make them an objectively baseless abuse of process. They were not.

Plaintiffs also focus on the larger set of defendants' petitioning, claiming that the CFTC disagreed with all of it, and it was a baseless sham. *First*, however, all of this petitioning aside from the letters already has been immunized. As the Seventh Circuit instructed in *Mercatus*, the court extracts "any conduct that is immunized" under *Noerr-Pennington* from its assessment of "the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability." 641 F.3d at 839. Plaintiffs' attempt to shoehorn into their regulatory delay claim ample evidence that Judge Zagel already excluded as immunized runs afoul of this instruction in *Mercatus.*

*Second*, even if it had not already been immunized, defendants' other legislative petitioning does not meet the very high bar for objective baselessness in the legislative context. The CFTC agreed with or held USFE to its proposed

"undertakings" to address a number of defendants' comments and concerns, including defendants' objections to USFE's one-member board, USFE's proposed global or cross-border clearing link, and USFE's proposed incentive programs. R. 731 ¶¶ 48, 50-52, 62, 68-69. CME's Chairman noted that defendants' efforts succeeded because USFE "will not be able to implement any cross border clearing link without approval," meaning that competition would occur "on a level playing field." R. 733 Ex. 133.

Moreover, defendants are correct that the fact that the CFTC staff addressed all of the issues raised by defendants speaks to their substantiality. The CFTC did not even address many of the other comments filed. *See* R. 718 Ex. 67. The Court therefore concludes as a matter of law that defendants' conduct did not rise to the level of objective baselessness, a standard that is "virtually impossible" to meet in the legislative context. *See* Areeda & Hovenkamp, *supra*, § 203.

### b.    Subjective Evidence

In discussing their regulatory delay theory, plaintiffs focus heavily on evidence of defendants' subjective intent without grounding that discussion in the governing legal standards. Plaintiffs try to put the December 9 letters in the context of "a larger course of conduct designed to delay USFE's entry," relying on the coordination and intent-related evidence summarized above. *See* R. 732 at 28-29. But because the Court concludes that defendants' challenged activity was not objectively baseless, it does not reach the issue of defendants' subjective motivation under *PRE*. *See* 508 U.S. at 60. Indeed, the Supreme Court in *Noerr* found political

activity immunized despite the fact that petitioners' "sole purpose . . . was to destroy [their rivals] as competitors," and their efforts were conducted unethically. 365 U.S. at 138-41. And the Supreme Court in *PRE* expressly "dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's purposes were to delay [the plaintiff's] entry into the market." 508 U.S. at 59-60. Evidence of defendants' subjective intent is therefore irrelevant.

## 2. Antitrust Injury

Defendants maintain that there is an independent basis for granting summary judgment on plaintiffs' regulatory delay theory based on the scheduling letters: lack of antitrust injury. Defendants argue that there is an "insurmountable gap in Plaintiffs' causation theory" linking defendants' letters—which the CFTC acted upon favorably—to any delay in the CFTC's approval of USFE's application. R. 710 at 14. Defendants point to: (1) USFE's 30(b)(6) deponent's testimony that the January 27, 2004 announcement of a public hearing "was the first time USFE received any indication concerning the timing of the CFTC's decision" (R. 731 ¶ 67); (2) the letter the CFTC wrote to USFE on December 19, 2003 stressing that "the CFTC cannot and has not committed itself to any earlier date [than March 15, 2004] by which a decision or designation approval will be made, and certainly cannot and has not committed itself to a favorable decision on the application" (*id.* ¶ 58); and (3) the CFTC's conversations with USFE in January 2004 about "draft undertakings" that could "move" the CFTC "away from the position that the USFE application is

materially incomplete and therefore ineligible for designation (as a result of the proposed [global] clearing link)" (*id.* ¶ 62).

The Court finds this causation argument to be simply another facet of defendants' *Noerr-Pennington* argument. The cases on which defendants rely recited the relevant causation-related principles as an extra justification for *Noerr-Pennington* immunity in cases where legislative persuasion is successful. *See Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, 2017 WL 1178224, at *3 (N.D. Ill. Mar. 30, 2017) (the *Noerr-Pennington* "principle follows in part from basic notions of causation: namely, when the government acts based on petitioning, any purportedly unlawful result is most proximately caused by government action, not by the private petitioning"); *Associated Bodywork*, 897 F. Supp. at 1120 (explaining that under *Noerr-Pennington* principles, "where . . . the alleged injury stems from a competitor's success in influencing legislation," the legislatures' actions, while "encouraged" by defendant, "compris[ed] a supervening 'cause,'" breaking the causal "link"). The fact that the CFTC acted on defendants' scheduling letters and subsequently indicated that it had never committed itself to a date earlier than March 15, 2004 for approving USFE's DCM application breaks the causal chain and provides further support for finding those letters immunized under *Noerr-Pennington*.

*       *       *

In the wake of Judge Zagel's predatory pricing holding, plaintiffs made the regulatory delay theory their cornerstone. The Court agrees with defendants that in

doing so, plaintiffs focus on legislative petitioning with Congress and the CFTC that lies at the heart of *Noerr-Pennington*. There would be a significant chilling effect if market participants had to fear treble damages if a regulator disagreed about their comments about competitors. *See, e.g.*, *Noerr*, 365 U.S. at 139 (holding businesses liable for urging government action to achieve competitive advantage would deprive the government of "a valuable source of information" and "deprive the people of their right to petition in the very instances in which that right may be of the most importance to them"); *Mercatus*, 641 F.3d at 846 ("*Noerr-Pennington* was crafted to protect the freedom to petition guaranteed under the First Amendment . . . . [Improper] application of the sham exception might inadvertently stifle the legitimate exercise of this core right."). Without the regulatory delay theory or any evidence of predatory pricing, the legs are cut out from under plaintiffs' case.

## II.     Clearing Link And Open Interest Transfer Theory

Plaintiffs' second theory is that defendants conspired to deprive plaintiffs of liquidity through their clearing link and the transfer of CBOT's open interest from BOTCC to CME. Defendants argue that: (1) this theory is foreclosed by implied antitrust immunity because the CFTC formally approved the clearing link and open interest transfer; and (2) this theory is not actionable under the antitrust laws.

### A.     Implied Antitrust Immunity

#### 1.     Key Principles Of Implied Immunity Doctrine And Seventh Circuit's *American Agriculture* Decision

The implied antitrust immunity doctrine originated in the SEC context. The Supreme Court has found implied antitrust immunity where the SEC effectively

authorized the conduct in question, *Gordon v. N.Y. Stock Exchange*, 422 U.S. 659 (1975), where the SEC chose not to issue prohibitions or restrictions despite having authority to do so, *United States v. Nat'l Assoc. of Sec. Dealers, Inc.*, 422 U.S. 694 (1975), and where the SEC disapproved the challenged practices, but it was possible that lines drawn by antitrust courts could lead to future conflicts with SEC determinations, *Credit Suisse Sec. v. Billing*, 551 U.S. 264 (2007).

In its most recent articulation of the doctrine in *Credit Suisse*, the Supreme Court explained that conduct is implicitly immune from antitrust liability where finding liability would create a risk of "clear repugnancy" or "clear incompati[bility]" between a specialized regulatory scheme and the antitrust laws. 551 U.S. at 275. Building on principles in *Gordon* and *NASD*, the *Credit Suisse* Court identified a four-part test for implied antitrust immunity:

> (1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entit[y] exercise[s] that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct . . . [and (4) whether] the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate.

*Id.* at 275-76.

Just as the Seventh Circuit's decision in *Mercatus* had important implications for plaintiffs' regulatory delay theory, the Seventh Circuit's decision in *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147 (7th Cir. 1992), has important implications for plaintiffs' clearing link and open interest transfer theory. In *American Agriculture*, the Seventh Circuit reversed a summary

judgment decision by the district court applying implied antitrust immunity to bar an antitrust claim based on an emergency resolution adopted by CBOT. *Id.* at 1150-51. In that case, "[a]fter receiving notice of the CBOT's adoption of the [emergency resolution], the [CFTC] took no formal action; it neither overturned nor approved the Resolution." *Id.* at 1151. Applying cases from the SEC context, the *American Agriculture* court delineated the circumstances in which it would be appropriate to find that "the CEA"—*i.e.*, the law that "governs the trading of commodity futures contracts, and grants to the [CFTC] the authority, in large measure, to implement the regulatory regime established therein"—"has impliedly repealed the antitrust laws." *Id.* at 1150, 1158. It explained that there are "two variants of implied repealer": (1) "pervasive repealer," where agency initiative controls every aspect of defendant's behavior; and (2) repealer "immuniz[ing] from antitrust attack activities that were ([a]) required by law or the relevant agency, or ([b]) scrutinized and approved by the agency." *Id.* at 1158.

The Seventh Circuit found no pervasive repealer in the CEA context, citing the "legislative history" of the CEA that "demonstrates that Congress intended to leave federal courts with at least some authority over exchange practices." *Id.* at 1160-61. The Seventh Circuit also found that the CFTC had not ordered CBOT to take action so as to satisfy the "required by law or the relevant agency" prong. *Id.* at 1158-61. Next, the *American Agriculture* court analyzed whether the "scrutiny and approval" prong of implied repealer was satisfied. *Id.* at 1162-67. After distilling key principles from the Supreme Court's SEC cases, the *American Agriculture* court

41

found the issue of applying antitrust immunity principles in that case to be "admittedly a close one," but "conclude[d] that the regulatory supervision in th[at] case was not sufficient to cloak the [emergency] Resolution with . . . immunity." *Id.* at 1163. In support, the court emphasized that the CFTC "never formally voted on or approved" the resolution, meaning that its "approval . . . was not the product of any affirmative action, but rather of acquiescence, or the failure to take affirmative action." *Id.*

Although the Supreme Court's decision in *Gordon* applying antitrust immunity had likewise involved acquiescence on the part of the regulatory body (the SEC), the *American Agriculture* court distinguished *Gordon* on several bases. "[T]he most significant distinction" between that case and *Gordon* "concern[ed] the availability of judicial review," which *Gordon* "emphasized . . . was an important— and perhaps essential—ingredient to any claim of implied antitrust immunity." *Id.* at 1164. The *American Agriculture* court explicitly contrasted the CFTC's formal "approval or disapproval" of "nonemergency exchange rules," which is "presumably subject to judicial review," with the emergency resolution in that case that was not. *Id.* at 1164-65.

Another basis on which the *American Agriculture* court distinguished *Gordon* was the SEC's "deep and serious study" of the issue in *Gordon* and "Congress' 'continued approval' of the SEC's regulatory track record." *Id.* The *American Agriculture* court explained that "[t]he fact that an agency let stand a practice voluntarily initiated by a regulatory entity—even when it had the power to review,

modify and overturn that practice—is not sufficient, in and of itself to confer antitrust immunity. Also pertinent is the *nature* and *degree* of the agency supervision at issue." *Id.* at 1163.

Near the end of its opinion, the *American Agriculture* court gave the following summary statement:

> [I]mmunity is proper when the relevant agency's scrutiny and approval of the challenged practice is active, intrusive and appropriately deliberative. Put another way, an antitrust court, before relinquishing jurisdiction over allegedly anticompetitive activities, must be convinced that the agency has exercised its independent judgment in reflecting upon and approving the activity at issue. Moreover, the availability of judicial review, even if not the *sine qua non* of immunity, is extremely important. We do not deny that the CEA and its enabling regulations lay in place a regulatory framework under which the [CFTC] can exercise the requisite degree of supervision. Here, however, the [CFTC] did not utilize that framework.

*Id.* at 1167. Therefore, the Court held, implied antitrust immunity did not apply.

## 2. Applicability Of Implied Immunity In CEA Context

Plaintiffs take issue as a threshold matter with the application of SEC implied immunity cases in the CEA context. Plaintiffs point to the legislative history of the CEA considering and rejecting blanket antitrust exemption. *See, e.g.*, *Strobl v. New York Mercantile Exch.*, 768 F.2d 22, 29 (2d Cir. 1985) (summarizing legislative history). They point to the general CEA savings clause explaining that nothing in the CEA "shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). And they point to the CFTC's acknowledgement when addressing potential "Fair Competition Issues" raised by CBOT with respect to USFE's DCM application "that [USFE] will be subject to *the*

*federal antitrust laws* as well as Commission oversight . . ." R. 733 Ex. 110 at 126-28 (emphasis added). As plaintiffs acknowledge, however, all this means is that the CEA "forecloses wholesale antitrust immunity." R. 732 at 33. It does not mean that a *Credit Suisse* implied immunity analysis does not apply.

Plaintiffs also say that securities and commodity futures industries are regulated differently. A 2009 Treasury Department White Paper noted that the CFTC "employs a 'principles-based approach' to regulation of exchanges, clearing organizations, and intermediaries; while pursuant to the securities laws, the SEC employs a 'rules-based approach.'" R. 733 Ex. 183. It is true that after the Commodities Futures Modernization Act of 2000, the CFTC no longer has to "approve most contract market rules." R. 733 Ex. 184. As defendants point out, however, the Commodity Futures Modernization Act expressly preserved the option for registered entities to invoke a prior approval process asking the CFTC to formally determine whether a submitted rule is consistent with the CEA. *See* 7 U.S.C. § 7a-2(c) (2000). In doing so, the CFTC must take into account the "public interest to be protected by antitrust laws" and "endeavor to take the least anticompetitive means of achieving the objectives of" the CEA. 7 U.S.C. § 19(b) (2000).

The implied immunity doctrine rests on the finding of a "plain repugnancy between the antitrust and regulatory provisions," focusing on "the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws." *Credit Suisse*,

551 U.S. at 271-72. In other words, the application of implied repealer principles is context and fact specific. It does not apply wholesale in particular regulatory areas and not in others. Furthermore, the Seventh Circuit has already applied implied antitrust immunity principles from the SEC context in the CEA context in *American Agriculture*. Nowhere does *American Agriculture* indicate that inherent differences between the securities and commodities contexts means that the same antitrust immunity principles do not apply. *See also In re Western States Wholesale Natural Gas Antitrust Litig.*, 661 F. Supp. 2d 1172, 1178-81 (D. Nev. 2009) (case cited by plaintiffs acknowledging that the CEA can implicitly preclude the antitrust laws' application, but finding no implied immunity because that case involved conduct explicitly "prohibited by the CEA.").

### 3. Appropriateness Of Deciding Implied Immunity As A Matter Of Law

Plaintiffs also argue as a threshold matter that the "implied immunity analysis" is "fact-specific" and should not be decided as a matter of law, citing *Friedman v. Salomon/Smith Barney*, 313 F.3d 796, 799 (2d Cir. 2002). But the Supreme Court held in *Gordon* that the application of the implied immunity doctrine is a threshold legal question. *See* 422 U.S. at 688 (the "factual question as to whether fixed commission rates are actually necessary to the operation of the exchanges" is irrelevant to the "legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme"); *see also id.* at 687 (rejecting approach in *Thill Sec. Corp. v. N.Y. Stock Exch.*, 433 F.2d 264 (7th Cir. 1970), of "view[ing] the question of implied repeal as a question of fact"). In

*Friedman* itself the issue was decided as a matter of law. 313 F.3d at 797-99. The issue also was decided as a matter of law in *American Agriculture* and *Credit Suisse*. Implied antitrust immunity is not an issue for the jury, but a threshold determination for the Court.

### 4. Application Of Implied Immunity Doctrine Here

Turning to the application of implied immunity principles to the facts here, the Court agrees with defendants that on the spectrum set forth in the SEC cases ranging from mere acquiescence to formal approval of defendants' challenged conduct, this case falls on the latter end. Unlike in *American Agriculture*, the CFTC formally approved defendants' clearing link and open interest transfer. This clear, affirmative approval goes beyond actions of the SEC in *Credit Suisse, NASD*, and *Gordon* that were found to warrant immunity. Also, unlike in *American Agriculture*, the CFTC's formal approval was subject to judicial review under the Administrative Procedure Act just like the SEC's actions in *Gordon*—the factor that the Seventh Circuit in *American Agriculture* described as "extremely important." 977 F.2d at 1167. Applying the four-part test from *Credit Suisse* confirms the appropriateness of finding implied immunity here.

**First factor (regulatory authority to supervise activity).** The first factor is easily satisfied. The CFTC has had authority to review and approve exchange rules since its creation in 1974 (*see* 7 U.S.C. § 7a-2(c)), and specifically to regulate the clearing of futures transactions (*see* 17 C.F.R. Part 39).

**Second factor (evidence that agency exercises regulatory authority).**
The second factor also is easily met. The CFTC exercised its regulatory authority to approve the very rules with respect to the clearing link and open interest transfer that plaintiffs challenge, and it has routinely approved DCM rules since its creation. *See* CFTC Industry Filings, Rules & Rule Amendments, https://www.cftc.gov/IndustryOversight/IndustryFilings/index.htm.

The CFTC also exercised its regulatory authority in this area when considering market structure and competition issues related to defendants' rules in the year preceding those rules' approval. In its June 2002 report, the CFTC acknowledged the potential benefits of mandated fungibility (essentially, the scenario USFE demands in this case), but warned that it "could decrease the potential reward [for an exchange from developing a new product] and therefore decrease the incentive for innovation," and could "subject[ ] clearing organizations to one other's credit risk involuntarily." R. 731 ¶¶ 32-33. The CFTC made clear when it approved defendants' rules that it had been considering "the policy and legal issues involved" for the past year. *Id.* ¶ 27. The CFTC later concluded when subsequently approving CBOT's DCM application that "any potential antitrust issues are outweighed by the benefits to be gained including potential clearing efficiencies, significant cost savings for members and customers, and systemic risk abatement." *Id.* ¶ 29. The CFTC thus clearly exercised its regulatory authority in the area of defendants' challenged conduct.

**Third factor (a resulting risk of conflicting guidance).** The Court further finds that plaintiffs' challenge places the CEA and the antitrust laws in an actual irreconcilable conflict because the CFTC expressly approved defendants' rules as consistent with the CEA, notwithstanding possible anticompetitive effects. The CEA assigns to the CFTC the responsibility to "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives of [the CEA]" when approving a contract market rule. 7 U.S.C. § 19(b). And the CFTC explicitly did so here. The CFTC allowed a comment period during which USFE and others submitted objections to the rules (and particularly Regulation 701.01 regarding the open interest transfer) based on "anti-competitive impact." R. 733 ¶ 23. In approving the rules, the CFTC explained: (1) that the comment letters had raised the concern that the proposed rules "would violate the obligations of [CBOT] and the Commission in light of the antitrust provisions of the Act" (*id.* ¶ 24); (2) that the CFTC had considered these comment letters and had been considering the "market structure and competition" issues involved since June 2002 (*id.* ¶ 25); and (3) that the CFTC ultimately found that "no alternatives to the use of a single dedicated clearinghouse exist" (*id.*) and that defendants' rules "support[ed] innovation in the futures industry" (*id.* ¶ 27). Indeed, the conflict created by recognizing an antitrust claim would be even stronger here than in *Credit Suisse* because it would be an actual conflict with the CFTC's assessment, including its balancing of antitrust risk against other factors, rather than a hypothetical one. *See* 551 U.S. 281-82.

**Fourth factor (whether conflict affected practices lying squarely within regulated area).** Finally, the Court finds the conflict affects the practices of DCMs and clearing organizations, and those practices lie at the heart of the CFTC's oversight responsibilities, as the many statutory provisions and rules addressing those practices show. *See, e.g.*, 7 U.S.C. § 7(d) (CEA's core principles for DCMs); *id.* § 7a-1(c) (CEA's core principles for clearing organizations); 17 C.F.R. Part 38 (CFTC rules for DCMs); *id.* Part 39 (CFTC rules for clearing organizations).

Plaintiffs acknowledge that the CEA regulates the broad topic of exchange-directed clearing, but they emphasize that the CFTC "had not previously reviewed or ruled on" the "specific forced transfer" of open interest. R. 732 at 44. The important point, however, is that the CFTC did rule on it here. And it did so as part of its broader consideration of whether to keep a single clearinghouse model or adopt a model with more fungibility and open access clearing. The open interest transfer defendants sought was directly related to the single clearinghouse model. In light of that model, not transferring would mean leaving the open interest at CBOT's previous clearinghouse (BOTCC) that would now become USFE's clearinghouse.

The CFTC evaluated in 2002-2003 and then again in 2009 whether to move to a model more akin to securities markets where contracts are fungible between competing exchanges and open access clearing is mandated, and it declined to change the model. R. 731 ¶¶ 31-35, 38. The Court therefore finds that the conflict between the CFTC's approval of the open interest transfer and recognizing an

antitrust claim based on that transfer falls squarely within an area the CEA regulates (clearing organization and DCM practices).

Beyond the *Credit Suisse* analysis, plaintiffs' opposition latches onto the language in *American Agriculture*, that "outside the context of a pervasive regulatory scheme, [implied] immunity is proper when the relevant agency's scrutiny and approval of the challenged practice is active, intrusive and appropriately deliberative." 977 F.2d at 1167 (citing *Gordon*, 422 U.S. at 689-91). Plaintiffs argue that rather than being active and appropriately deliberative, the CFTC's review of defendants' rules, and particularly the open interest transfer rules, was "cursory and haphazard" as a result of defendants' own actions. R. 732 at 37. But a test that takes a deep dive into the factual nuances of the CFTC's review to determine if it was sufficiently deliberative is not the law. The four-part test in *Credit Suisse* is the law. As defendants emphasize, in the sentences immediately following the sentence on which plaintiffs focus, the *American Agriculture* court added: "Put another way, an antitrust court, before relinquishing jurisdiction over allegedly anticompetitive activities, must be convinced that the agency has exercised its independent judgment in reflecting upon and approving the activity at issue. Moreover, the availability of judicial review, even if not the *sine qua non* of immunity, is extremely important." 977 F.2d at 1167.

Here, unlike in *American Agriculture*, there is no doubt that the CFTC exercised its independent judgment in reflecting on and approving the activity in question—it expressly approved it. Indeed, the *American Agriculture* court

contrasted the mere acquiescence to an emergency rule in that case with "[t]he Commission's [formal] approval or disapproval of [exchange] rules." *Id.* at 1164. And unlike in *American Agriculture*, judicial review was available here.

Read in proper context, the Court believes that the "active, intrusive and appropriately deliberative" inquiry is short-circuited in cases where an agency gives express approval. It was because the CFTC in *American Agriculture* had merely acquiesced to the challenged conduct that the court undertook deeper scrutiny to determine whether the CFTC had in fact "exercised . . . independent judgment." *Id.*

In any event, even if a more detailed assessment of the CFTC's review is appropriate, that does not change the Court's conclusion. Plaintiffs first try to establish that the shortened review period was based on a misrepresentation by CBOT. They cite an email reporting that CBOT's general counsel "noted" to the CFTC in June 2003 "that there was a walkaway provision in the [clearing link agreement] as of mid-July based on obtaining regulatory approval" for "rule changes." R. 733 Ex. 165. Plaintiffs explain that CME's CEO had expressed its intent in a July 7, 2003 board meeting to let the "walk-away option" "lapse." *Id.* Ex. 167 at 4. Notably, however, the CME board meeting summary does not indicate that CBOT or its general counsel was aware of CME's position on the walk-away option. Plaintiffs further say the CFTC relied on CBOT's misrepresentation about the walk-away option to shorten the anticipated 45-day period for public comment to four days. They cite comments from CFTC members complaining about the short timeframe resulting from the mid-July deadline. R. 733 Ex. 166; R. 733 Ex. 173.

Ultimately, however, regardless of the duration of the CFTC's review period or the cause of that duration, plaintiffs ignore the broader backdrop of consideration by the CFTC of competition and antitrust issues imposed by the single clearinghouse model. And they ignore that the CFTC actively solicited comment letters—despite the fact that it was not required to do so—and considered them when approving the rules. CFTC staff acknowledged and weighed the antitrust and competition objections raised and concluded that there were no viable alternatives to the "single dedicated clearinghouse" model. R. 733 ¶¶ 25, 29.

At bottom, this was not a situation like in *American Agriculture* of nonpublic review and no express approval. This was a case of express CFTC approval, after a year's worth of considering related competition issues, all of which was subject to Administrative Procedure Act review that plaintiffs did not seek. R. 731 ¶ 28. Thus, the Court agrees with defendants that the CFTC's decision approving the clearing link and open interest transfer are implicitly immune from antitrust scrutiny.

### B.  Actionability Under Antitrust Laws

Defendants have an alternative basis for summary judgment on plaintiffs' liquidity deprivation theory based on the clearing link agreement and open interest transfer: that it is not actionable under the antitrust laws. Defendants note that even now, thirteen years after this theory first appeared in plaintiffs' second amended complaint, plaintiffs have not identified the specific antitrust doctrines on which they rely in support. And that is because, defendants say, this theory contravenes basic antitrust principles.

Because the parties raise different arguments with respect to the open interest transfer and the clearing link components of this theory, the Court considers them separately.

### 1. Transfer Of Open Interest

Defendants contend that plaintiffs' transfer of open interest theory assumes that CBOT should have left open positions in the CBOT Treasury futures contracts at BOTCC so that USFE could use them to attract liquidity in its new copy-cat futures contracts. The Court agrees with defendants that such an assumption runs headlong into the basic antitrust principle that there is "no duty to aid competitors" in light of the "uncertain virtue of forced sharing." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 410 (2004); *see also Mercatus*, 641 F.3d at 857 ("[e]ven if the Hospital had monopoly power," it had "no duty to step aside and allow Mercatus to make off with its physicians, patients, and revenue"). Defendants had no duty to aid plaintiffs—their competitors hoping to take over the U.S. Treasury futures and options market—by voluntarily leaving open positions at BOTCC.

Plaintiffs argue that defendants misconstrue their theory. They say they are not arguing that defendants had a duty to aid plaintiffs through forced sharing. Instead, plaintiffs argue that CBOT "forcibly transferred" to CME an interest that did not belong to CBOT. R. 732 at 50. Relying on their expert report and internal defendant documents, plaintiffs claim that the open interest "was the product of separate and independent contracts between BOTCC and the traders," such that

"CBOT had no right to dictate where those open positions resided." *Id.* (citing R. 742 ¶¶ 1, 27). Defendants dispute these facts. *See* R. 742 ¶¶ 1, 27.

The Court finds this fact dispute regarding ownership of open interests irrelevant for several reasons. For starters, if plaintiffs are correct that separate and independent contracts existed between BOTCC and traders, then any breach of those contracts would result in separate claims between BOTCC and the traders irrelevant to the antitrust claim before this Court. Moreover, the undisputed facts are that the CFTC approved the open interest transfer proposed by CBOT. Plaintiffs offer no legal support for the proposition that CBOT had no right to direct where the open positions in the contracts were cleared. Plaintiffs' position is particularly ironic given that USFE negotiated a term in its agreement with BOTCC to do precisely what CBOT had done in the event of termination: transfer open interest in USFE contracts to another clearinghouse. R. 731 ¶ 40. USFE sought this requirement because "[i]n the case of changing a clearinghouse, it is important for the exchange to have a smooth transition and a functioning market over that change." *Id.* This was (and still is) the prevailing regulatory structure, and USFE negotiated for it in its own clearing services agreement. The Court agrees with defendants that plaintiffs' position on the open interest transfer would require forced sharing, or aiding of CBOT's competitor, by leaving open interest at BOTCC instead of using regulatory channels to approve a transfer of that open interest to CME.

A narrow exception to the "no duty to aid competitors" rule lies "at or near the outer boundary of [Sherman Act] § 2 liability" and applies where a firm unilaterally terminates a longstanding course of dealing with its rival and removes from the market services "marketed or available to the public." *Trinko*, 540 U.S. at 409-10 (clarifying the Court's earlier decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)); *see also Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2014 WL 656753, at *7 (N.D. Ill. Feb. 20, 2014) ("[T]he Seventh Circuit has recognized that *Aspen*-like circumstances are a rare exception."). This is the exception cited by Judge Zagel in his prior summary judgment ruling allowing further discovery on plaintiffs' open interest theory to resolve the issue of defendants' intent. R. 445 at 9. But plaintiffs do not claim that this case involves *Aspen*-like circumstances. And for good reason, since that doctrine does not fit the facts here.

Beyond their emphatic attempts to explain what their open interest claim is *not*, *i.e.*, a forced sharing claim (*see* R. 732 at 50-51), plaintiffs do not clearly articulate what their claim *is* and how it fits within the antitrust laws. Plaintiffs' theory thus would require this Court to impose a novel exception to the "no duty to aid competitors" rule, which the Court is particularly reluctant to do in light of the complexities of the industry and the close supervision of the CFTC. *See, e.g.*, *N.Y. Mercantile Exch., Inc. v. Intercont'l Exch., Inc.*, 323 F. Supp. 2d 559, 570 (S.D.N.Y. 2004) ("the CFTC is in a better position than a general antitrust court to determine the scope and terms of any forced sharing of settlement prices among the exchanges

that it regulates"). The Court agrees with defendants that plaintiffs' theory based on the open interest transfer, if actionable at all, lies on the outer bounds of antitrust law, and is best left to the CFTC to regulate—a conclusion that bolsters this Court's grant of summary judgment on this theory. *See, e.g.*, *Trinko*, 540 U.S. at 410-16 (affirming dismissal where traditional antitrust principles did not justify new addition to "no duty to aid competitors" rule, including because the challenged conduct was subject to the FCC's regulatory authority and "[a]ntitrust analysis must always be attuned to . . . the significance of regulation" in "the industry").

### 2. Clearing Link

With respect to the clearing link, plaintiffs' theory is that defendants' exclusive clearing link "had the requisite exclusionary effect to constitute both an act of monopolization and an actionable conspiracy" because it "drained the open interest from BOTCC and locked it up at CME." R. 732 at 47-48. Plaintiffs say this arrangement "impaired USFE's clearing through BOTCC." *Id.* at 47.

Under both §§ 1 and 2 of the Sherman Act, "an exclusive contract is illegal only if it substantially forecloses competition in the relevant market." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *7-8 (C.D. Ill. Sept. 30, 2016), *aff'd,* 859 F.3d 408 (7th Cir. 2017); *accord Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982) ("In the context of exclusive dealing arrangements, . . . the plaintiff can prevail only by showing that the agreement in question results in a substantial foreclosure of competition in an area of effective competition, that is, in a relevant market."). Defendants argue that

their clearing agreement did not "substantial[ly] foreclose[ ]" USFE from the clearing market for the simple reason that USFE obtained clearing services from BOTCC. *See id.*; *see also Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 (8th Cir. 1987) (plaintiff "produced no evidence suggesting that [defendant's] exclusive dealing provisions generally prevent[ed] competitors from finding effective distributors"). This argument is supported by the DOJ's finding in 2007 (as part of its review of CME's proposed merger with CBOT) after an "extensive investigation" of the clearing link agreement that it was not "likely to reduce competition substantially" or to "foreclose entry by other exchanges." R. 731 ¶ 36.

Plaintiffs respond that they did not need to be foreclosed from the clearing market for their injury to be actionable under the antitrust laws. They cite *United States v. Dentsply Int'l Inc.*, 399 F.3d 181 (3d Cir. 2005), which found that where an exclusive dealing arrangement ensured that sales of a product would be kept "below the critical level necessary for any rival to pose a real threat to Dentsply's market share," the requisite anticompetitive effect could be shown. *Id.* at 191. *Dentsply* relied on the principle that "[a] set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller firm's growth." *Id.* But plaintiffs do not point to any facts supporting that BOTCC was an inferior or more expensive outlet, or that consumer injury resulted. And as defendants point out, *Dentsply* is in tension with Seventh Circuit

law. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (exclusive deal not anticompetitive despite causing plaintiff to "expand more slowly than it would otherwise have done, and at somewhat higher cost").

As with the open interest component of plaintiffs' second theory, the Court agrees with defendants that an exclusive dealing theory based on the clearing link that did not in fact exclude USFE from the clearing market lies on the outer bounds of antitrust law if it is actionable at all. *Cf. Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (affirming summary judgment where exclusive dealing arrangement did not prevent plaintiff from having "a shot at . . . outbidding" its rival). This conclusion further supports this Court's grant of summary judgment of plaintiffs' second theory.[7]

## III.    Customer Threats and Public Misinformation Theory

After plaintiffs had a full opportunity for discovery as to consumer threats, plaintiffs still were unable to find support in the documents or depositions. In support of the consumer threats component of their third theory, plaintiffs now point only to their 2006 interrogatory response for evidence that "[d]efendants also threatened and intimidated traders." R. 731 ¶ 37 & Ex. 211 at 8-9. But this

---

[7]    Defendants also say USFE selected BOTCC as its preferred clearing provider before learning of the CBOT-CME clearing link, meaning that plaintiffs did not suffer antitrust injury from not being able to clear through CME. *See Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996) (affirming dismissal where plaintiff "never tried to make a better offer," explaining that "[plaintiff] should try to outbid [defendants] in the marketplace, rather than to outmaneuver them in court"). The Court does not find it appropriate to grant judgment as a matter of law on this alternative basis. None of the exhibits defendants cite conclusively shows that USFE selected BOTCC as its preferred provider *before* learning of the clearing link. R. 731 ¶¶ 7-8, 12-15.

interrogatory response is not admissible evidence, and it does not contain cites to deposition testimony or other admissible evidence.

Discovery also has not borne out the public misinformation component of plaintiffs' third theory in the way plaintiffs hoped. Plaintiffs claim that CBOT made intentionally false and deceptive public statements to thwart USFE's entry into the market. The speech or statements plaintiffs point to, however, are from internal presentations and memos rather than published articles. R. 742 ¶¶ 35-36.

Moreover, although the record supports that defendants separately hired media consultants who prepared stories as part of defendants' campaign to dissuade regulators from supporting USFE, *id.* ¶ 36, at least the majority of this activity was related to defendants' CFTC lobbying efforts and therefore falling within *Noerr-Pennington* immunity. The *Mercatus* court held that the "public relations campaign" in that case was "sheltered by *Noerr-Pennington*," because "'a publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity.'" 641 F.3d at 849 (quoting *Allied Tube*, 486 U.S. at 499-500). This is the case even where the campaign "employs unethical and deceptive methods." *Id.* And it is the case even where the campaign persuades people to "refuse or hesitate to do business with the target, causing that target some injury despite the government's refusal to act. Such injuries are inevitable whenever a business attempts to rally the public to encourage government action that will adversely affect one of its competitors." *Id.* at 850.

The *Mercatus* court further held that even when unrelated to legislative action, derogatory and false comments are "outside the reach of the antitrust laws, however critical they may be of a competitor[ ]," unless they are accompanied by a "coercive enforcement mechanism[ ]." *Id.* at 851-53. Absent such a mechanism, "even demonstrably false [c]ommercial speech is not actionable under the antitrust laws." *Id.* at 852. "Examples of coercive mechanisms include the ability to boycott, the ability to enter into agreements not to distribute certain products or an inherent authority that can be used as leverage." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *8 (N.D. Ill. Aug. 29, 2013). The only allegedly coercive mechanism to which plaintiffs point here is CBOT's 99% market share. But *Mercatus* likewise involved an alleged monopolist with market power, and the false statements unrelated to legislative petitioning were not actionable because they "were not backed by any threats designed to coerce acceptance of the [defendant's] views about [plaintiff]." 641 F.3d at 851. Plaintiffs have not cited evidence of threats of coercion to accept defendants' views about plaintiffs here. As such, the Court finds that there is no evidence warranting a trial on this theory.

## IV.     Interference with Relationships Theory

Plaintiffs' final theory is that (a) CBOT attempted to interfere with USFE's contractual dealings with BOTCC and (b) defendants attempted to interfere with USFE's contractual dealings with the NFA.[8] Defendants say this theory is not

---

[8]     Plaintiffs also say that defendants "ignored" their theory that defendants interfered with contractual dealings with potential customers in addition to the contractual dealings with BOTCC and the NFA. R. 732 at 53. But plaintiffs do not

viable under the antitrust laws for a straightforward reason: USFE successfully entered into relationships with BOTCC and the NFA months before USFE launched its exchange. The Court agrees that this evidence forecloses plaintiffs' antitrust theory based on interference with relationships because it shows a lack of anticompetitive effect. *See Schachar v. Am. Academy of Opthamaology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (conduct "is not illegal without anticompetitive effects"). Plaintiffs do not meaningfully argue otherwise.

But the analysis of plaintiffs' Illinois tort claim based on the same evidence is not quite so simple. Under Illinois law, a claim for intentional interference with prospective economic advantage has four elements: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014).

Defendants argue that plaintiffs' Illinois tort claim fails at the outset because defendants did not cause a termination of the expected business relationship plaintiffs had with BOTCC and the NFA—to the contrary, plaintiffs successfully entered into business relationships with both entities. In support, defendants rely on *McCoy v. Gamesa Tech. Corp.*, 2013 WL 2636365 (N.D. Ill. June 12, 2013), *aff'd*

---

cite any evidence related to customer contract interference to support that theory. *See id.* Nor, as discussed above, have plaintiffs found any prospective customer to testify about alleged threats.

*on other grounds sub nom. McCoy*, 760 F.3d 674, which stated: "This Court has thoroughly reviewed Illinois law and can discern no instance in which a claim based upon interference with prospective economic advantage has survived where there has been no termination of the economic relations." *Id.* at *7. But the Seventh Circuit on appeal in *McCoy* clarified that while "[i]t is possible that Illinois courts would require a complete termination of the prospective relationship," "most Illinois cases on the subject involve an employee's suit against an employer for a rejection from another job, which is necessarily an all-or-nothing proposition." 760 F.3d at 686. The Seventh Circuit suggested that a plaintiff might be able to state a tort claim under Illinois law where the relationship at issue "was merely impaired but not terminated," if the plaintiff's "expectancy" was diminished. *Id.* Despite the Seventh Circuit's recognition of this possibility, it remains the case that no Illinois court appears to have recognized such a theory.

Even if Illinois courts do not require a complete termination of a business relationship, however, the Court still finds that plaintiffs' theory of tortious interference fails. A long line of Illinois cases makes clear that for purposes of the third element of the tort—*i.e.*, "an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy" (*id.* at 685)—interfering conduct *directed at the third-party* must cause the diminished expectancy. *See, e.g.*, *id.* at 686; *Galinski v. Kessler*, 480 N.E.2d 1176, 1180 (Ill. App. Ct. 1985) ("tort of interference with prospective economic advantage requires action by the defendant towards a third party which results in such interference"); *F.E.L.*

62

*Publications v. Catholic Bishop of Chicago*, 1989 WL 100006, at *1 (N.D. Ill. Aug. 22, 1989), *aff'd sub nom. Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254 (7th Cir. 1990) (plaintiff "must demonstrate . . . some action toward a third party which caused breach or termination of [plaintiff's] . . . expectancy"); *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 64657, at *10 (N.D. Ill. Jan. 8, 2014) ("It is insufficient for the purpose motivating the conduct to be to interfere with prospective business relations; the act itself must be directed toward the third party."); *see also Schuler v. Abbott Labs.*, 639 N.E.2d 144, 147-48 (Ill. App. Ct. 1993) (although there is no requirement that an "interfering party must make contact with the third party," "the interfering action [must] be directed in the first instance at the third party"). "Summary judgment is appropriate when the plaintiff fails to present adequate evidence of a causal connection between the defendant's conduct [directed toward the third party] and the third party's action." *F.E.L.*, 1989 WL 100006, at *1.

Here, the conduct plaintiffs allege defendants directed at BOTCC and the NFA—the third-parties at issue—is disconnected from the expectancy plaintiffs say was diminished. Taking the facts in the light most favorable to plaintiffs: (1) CBOT attempted to get exclusivity with BOTCC and later to acquire BOTCC to try to shut it down, and (2) defendants misrepresented the NFA's lawful capacity to contract with USFE, including threatening to sue to invalidate the NFA-USFE agreement. R. 742 ¶¶ 24-34, 39-40. But plaintiffs do not explain how these specific (and

ultimately unsuccessful) actions caused the diminishment of a reasonable expectancy plaintiffs had for their relationships with BOTCC or the NFA.

Rather, the only specific expectancy plaintiffs cite is that "USFE reasonably expected that the open interest would have remained at BOTCC . . . but for Defendants' anticompetitive conduct." R. 732 at 54. But it was not CBOT's alleged actions directed at BOTCC (or any actions directed at the NFA) that caused this change in plaintiffs' alleged expectancy. It was the open interest transfer rules that defendants proposed and that the CFTC approved. Absent a causal connection between the conduct directed toward a third-party and plaintiffs' alleged diminished expectancy, plaintiffs' tortious interference claim fails under Illinois law. *See, e.g.*, *F.E.L.*, 1989 WL 100006, at *1; *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 801 (7th Cir. 2007) (claim failed absent evidence of statements "directed at third-party potential customers" that diminished expectancy).

Nor is it clear for purposes of the first element of the tort how an expectancy that open positions would remain at BOTCC could be "reasonable" in light of the fact that the CFTC approved the open interest transfer. *See McCoy*, 760 F.3d at 685 (first element is a "reasonable expectancy"). It is plaintiffs' job on summary judgment to clearly articulate their legal theories, *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993), and to present "specific facts showing that there is a genuine issue for trial" on those theories, *Johnson*, 892 F.3d at 896. *See also Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 797, 810 (N.D. Ill. 2010) ("While we view the facts in the light most favorable to the nonmoving party,

there is an affirmative burden of production on the nonmoving party to defeat a proper summary judgment motion."). Plaintiffs have not done so with respect to their Illinois tort claim. The Court therefore grants summary judgment on that claim along with plaintiffs' antitrust claims.

## V. Causation

Finally, defendants argue that the lack of evidence that defendants' conduct caused USFE to fail entitles defendants to summary judgment on all of plaintiffs' antitrust theories. The Court need not reach this issue because it has already found that defendants are entitled to summary judgment on each theory.

## VI. Plaintiffs' Motion For Partial Summary Judgment

Because the Court has found summary judgment appropriate on plaintiffs' antitrust claims, plaintiffs' motion for partial summary judgment on the issues of the relevant market definition and CBOT's monopoly power is moot.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [708] and denies plaintiffs' motion for partial summary judgment [712] as moot.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: October 31, 2018